# HORTON *v.* THE UNITED STATES.

CRIMINAL LAW; HOMICIDE; JURYMEN, QUALIFICATION OF; CHALLENGES; REVERSIBLE ERROR; WITNESSES; EXPERT TESTIMONY; OPINION EVIDENCE; HYPOTHETICAL QUESTIONS; INSANITY; CHARGE AND INSTRUCTIONS TO JURY.

1. Under the Act of Congress of January 15, 1897 (29 Stat. 487), giving to juries the discretionary right in capital cases to qualify their verdict by adding the words "without capital punishment," *it would seem* that the jury, in such a case, should, as far as practicable, be composed of men qualified to determine the question of the guilt of the accused fairly and without subjection to the influence of a bias or prejudice in respect of the punishment to follow.

2. The qualification of a talesman to act as a juror is a question of mixed law and fact submitted to the sound discretion of the trial court, the exercise of which will not be disturbed except in case of manifest error to the prejudice of the accused.

3. Although error may have been committed by a trial court in a homicide case, in sustaining challenges for cause by the prosecution to talesmen when examined upon the *voir dire*, such error will not be held reversible error at the instance of the accused, when it appears that his peremptory challenges were not exhausted before a qualified jury was obtained. An

accused person acquires no vested right to have a particular member of the panel act as juror, until, at least, he shall have been accepted and sworn.

4. Failure by the prosecution in a capital case to give the correct address of a witness in the list of witnesses to be produced to prove the indictment, required by Sec. 1033, R. S. U. S., providing that such a list, containing the place of abode of each of such witnesses, shall be delivered to the accused two entire days before his trial, will not disqualify such witness from testifying and render the action of the trial court in allowing him to testify reversible error, where the record shows that the mistake was a natural one and that the accused knew who the witness was and how he might be found and was in no way deceived by the error in the address as given.

5. The disclaimer by a physician who is called by the accused in a homicide case, and who testifies that in his opinion the accused was insane, that he is an expert, will not deprive his testimony of the character of expert testimony when it otherwise appears that he is, at least to some degree, qualified to testify as an expert.

6. Considerable latitude in the cross-examination of experts to test their knowledge is often admissible, and its range is within the sound discretion of the trial court, the exercise of which will not be reviewed on appeal except in case of abuse.

7. The exclusion of the opinion of a witness in a homicide case as to the mental condition of the accused, is not error where no facts or circumstances are stated or offered to be proved by the witness upon which such opinion is founded, other than the fact that the accused had years ago received a severe blow on the back of the head which had rendered him unconscious for several hours.

8. A hypothetical question to be propounded an expert must be fairly framed with reference to the facts offered and relied on in the evidence, and the hypothesis must be clearly and distinctly presented, so that there may be no misunderstanding by the witness and no confusion in the minds of the jury.

9. A hypothetical question propounded an expert upon insanity in a homicide case considered and held to be a proper one under the circumstances.

10. The scope and limitation of hypothetical questions should be left largely to the discretion of the trial court.

11. The charge of a trial court in a homicide case defining insanity as a defense against conviction of crime, considered and held to be free from error.

12. Where, in a homicide case, the only defense is insanity, and there is no evidence to reduce the alleged crime from murder to manslaughter, it is not error for the trial court in its charge to

state to the jury that the evidence will not justify a verdict of manslaughter.

13. A prayer for instruction to the jury offered by the accused in a homicide case is properly refused by the trial court as incorrectly stating the duty and obligations of a juryman, which states that: "Each juror should decide for himself upon his oath as to what his verdict should be. No juror should yield his deliberate conscientious convictions as to what the verdict should be, either at the instance of a fellow juror or at the instance of a majority. Above all, no juror should yield his honest convictions for the sake of unanimity or to avert the disaster of a new trial."

No. 925.   Submitted October 18, 1899.   Decided October 25, 1899.

HEARING on an appeal by a defendant indicted for murder from a judgment of conviction entered upon the verdict of a jury. *Affirmed.*

The COURT in its opinion stated the case as follows:

The appellant, George W. Horton, was indicted in the Supreme Court of the District for the murder of Jane Nicholson, on June 24, 1898.

He was brought to trial and found guilty as charged. On June 6, 1899, his motion for new trial was overruled, and he was sentenced to be hanged on the 10th day of November, 1899. From that judgment he has appealed.

The facts of the homicide and the surrounding circumstances are thus stated in the bill of exceptions:

The United States gave evidence tending to prove that Jane Nicholson was killed by the defendant June 24, 1898, in Armory square, in the District of Columbia, by cutting her throat; that she had at least a dozen wounds above the waist; that two of them were fatal and that there were severe wounds on both hands; that one witness testified that deceased and defendant had been in the same park on the evening previous and had apparently been quarreling, and were apparently quarreling just prior to the killing; that defendant struck deceased with his knife and then walked away from her and returned and pulled up her head and

appeared to wash his hands in the blood; that he knelt upon her or beside her body and cut her repeatedly and stabbed her; that at the time he struck her with the knife there were present only one man and one woman, and she screamed; that the knife used was a penknife; that immediately other people gathered at the scene, and those present appeared to be struck dumb; that after defendant had first struck deceased he walked around her body and returned and again cut at her throat and reached his hand into the throat and drew out portions of the neck and cut them; that at this time there were persons present who might have prevented this cutting, but they seemed afraid to do so; that defendant appeared to be angry—one witness said savage, and another said he appeared to have a mad frenzy on him; that after defendant had first struck deceased she said to him, "Don't kill me," in very low tones; that as the deceased was dying the defendant grasped her hand and said, "Good bye, old girl; you will never deceive me any more," and folded her hands across her breast; that he also said, "I am done with you;" that he also said before the last cutting, "Are you not dead? If you are not I will kill you;" that he also said, "Damn you; you can't die, can you? I will see;" that he said, "Damn you; if you are not dead I will finish you;" 'and also said, "Good bye, Jane; good bye; you are gone; good bye;" that after defendant had killed deceased he took a bottle out of his pocket, turned it up to his mouth, and threw the bottle away; that he made no attempt to escape and said to the bystanders, "Gentlemen, don't be afraid; I did it;" that a police officer arrived just as Horton was walking away from the body and arrested him and took from his hand a penknife, which was open and covered with blood; that the officer asked the defendant his name; whereupon the defendant told him his name was Horton, and the officer said, "I know you; is that the Nicholson woman?" to which Horton replied, "Yes;" that the officer then took the defendant to the patrol

box, some distance away, and on the way there the defendant recited to the officer the circumstances of the meeting and killing; that the defendant was then taken to the Sixth Precinct police station, and, after answering the interrogatories usually put to prisoners, collapsed, and upon the suggestion of some one that he had taken poison he was driven hurriedly to the Emergency hospital and there put under an examination, which developed that he had not taken poison, and he there admitted that that was the fact; that he was then returned to the police station and placed in a cell; that shortly after being placed in the cell he was visited by his wife and had conversation with several officers and newspaper reporters in reference to the homicide and the circumstances surrounding the same; that he said he felt better than he had before in six months; that he told the officer to take the deceased to the morgue; that he had finished her; that she had told him she would not meet him again, and that he had killed her and was ready for the gallows; that he recognized the police lieutenant on reaching the station house and shortly after collapsed and was taken to the Emergency hospital to be treated for poisoning; that he was quickly discharged by the doctor as needing no treatment and not having taken poison; that he sent for his wife, who came an hour or two or three after the killing, and he talked with her and with others about the act; that he said, among other things, he was sorry he had not killed Judge Kimball and Commissioner Wight; that the woman he had killed had been the bane of his life, had lost him his place on the police force and destroyed his home, and on her account he had lost everything; that for a few hours after his arrest he inquired frequently for the deceased, frequently sighing heavily, and referred to her as "poor Janie," and "dear Janie," and asking if she was dead; that defendant when his wife came said he had not sent for her, and when she drew his attention to his situation and suggested that he should turn his thoughts to God he said

he would not do so, as it would be cowardly; that he said he had taken twelve grains of cyanide of potassium; that he had been on the police force from about 1888 for six or seven years and been dismissed for intoxication; that in 1897 he had successfully passed a clerical and physical examination and been reinstated, and after a few months been again dismissed for intoxication; that defendant said a few hours after the act that he had drank one or two whiskies and one or two beers during that day; that the defendant and the deceased had been intimate for a number of years and that the defendant was jealous of her.

The accused introduced proof tending to show that he was insane at the time of the commission of the offense.

*Mr. Tracy L. Jeffords, Mr. Robert H. Wells* and *Mr. Warder Voorhees* for the appellant:

1. An opinion adverse to the policy of capital punishment does not disqualify a juror. 1 Bishop Cr. Pro., Sec. 918, and cases cited; *Stratton* v. *People,* 5 Col. 276. To disqualify a juror it is not only necessary that he should have conscientious scruples which prevent him from standing indifferent between the prosecution and the accused, but there must be coupled with it such a condition as will prevent the juror from trying the case according to the law and the evidence. The question of scruples is not the test, but whether the juror can render a fair and impartial verdict. *Logan* v. *United States,* 144 U. S. 263 ; *Reynolds* v. *United States,* 98 U. S. 145 ; *Hopt* v. *Utah,* 120 U. S. 430 ; *Spies* v. *Illinois,* 123 U. S. 131 ; *Connors* v. *United States,* 158 U. S. 408. See, also, *Winston* v. *United States,* 172 U. S. 303.

The considerations which are proper for the jury to entertain and act upon in determining a verdict are not, when entertained by a juror being examined on his *voir dire,* grounds to sustain a challenge for cause. *United States* v. *Schneider,* 21 D. C. 388.

2. Under Sec. 1033, R. S., a defendant indicted for murder

is entitled to a copy of the indictment and a list of the
witnesses to·be produced on the trial ·two days before the
trial.    The provision is not directory only, but mandatory
to the Government, and its purpose is to inform the defend-
ant of the testimony which he will have to meet. and to
enable him to prepare his defense.    Being enacted for his
benefit, he may doubtless waive it if he pleases, but he has
a right to insist upon it, and if he seasonably does so, the
trial can not lawfully proceed until the requirement has
been complied with.    *United States* v. *Stewart,* 2 Dall. 343 ;·
*United States* v. *Curtis,* 4 Mason, 232 ;   *United States* v. *Dow,*
Taney, 34 ;   *Regina* v. *Frost,* 9 Car. & P. 129 : S. C., 2 Moody,
140 ;   *Lord* v. *State,* 18 N. H. 173 ;   *People* v. *Hall,* 48 Mich.
482 ;   *Keener* v. *State,* 18 Ga. 194–218 ;   *Logan* v. *United States,*
144 U. S. 263.

3.  Under certain circumstances it is permissible, on cross-
examination of an expert, to ask him if he agrees with cer-
tain authors, as a means of testing his knowledge, but in
such instances great care should be taken to confine such
cross-examination within reasonable limits and to see that
the quotations read to the witness are so fairly selected as
to present the author's views on the subject of examination.
1 Thompson on Trials, Sec. 633 *et seq.;*  *Insurance Co.* v. *Ellis,*
89 Ill. 516.

4.  A medical witness can not be contradicted by reading
to him the testimony of some other medical witness given
at another time.    *Olmstead* v. *Gere,* 100 Pa. St. 127 ; *People*
v. *Hall,* 48 Mich. 482 ;   *Gridley* v. *Bogs,* 62 Cal. 190 ; *Collier* v.
*Simpson,* 5 Carr & P. 73 ; *Davis* v. *State,* 38 Md. 15; *Sleeman*
v. *Shaw,* 68 Md. 11; *People* v. *Wheeler,* 65 Cal. 77 ; *Frazer*
v. *Jenner,* 42 Mich. 206 ; *Davis* v. *United States,* 165 U. S.
377.

5.  The testimony of John Hancock should not have been
excluded.    Any witness who knows the facts personally
may give his opinion thereon, and may do this concerning
matters with which he is especially acquainted, but which

can not be specifically described. 7 Encyc. L., 476, and cases cited. See, also, *Le Cointe* v. *United States,* 7 App. D. C. 16.

6. The witness Chapin did not claim to be an expert, and there is nothing in the record to show that he ever testified as such; but if he were, it would seem improper to allow him to testify as to the condition of appellant at a time not fixed and which is in no way connected with the question at issue. *Gibson* v. *Gibson,* 9 Yerg. (Tenn.) 329; *Dickenson* v. *Barber,* 9 Mass. 225; *Hawthorn* v. *King,* 8 Mass. 371; *Puryear* v. *Reese,* 6 Coldw. (Tenn.) 21; *White* v. *Bailey,* 10 Mich. 155; *Pearson* v. *People,* 79 N. Y. 424.

*Mr. T. H. Anderson,* U. S. Attorney for the District of Columbia, and *Mr. Ashley M. Gould,* Assistant Attorney, for the United States.

Mr. Justice SHEPARD delivered the opinion of the Court:·

1. The first three assignments of error may be conveniently considered together. In the course of the examination of talesmen touching their qualifications as jurors, three challenges made by the Government for cause, were sustained by the court, and exceptions were taken by the accused.

(1) One of these, Morris Fitzgerald, stated that he had "conscientious scruples against capital punishment."

(2) Morris Blackman was examined at length, and having stated that he had a leaning towards the penalty of imprisonment for life, but could agree to capital punishment where there was no doubt, the court inclined to hold him competent. Upon further examination, however, it appeared, as stated by the court and agreed to by the juror, that in a case where the proof showed guilt beyond a reasonable doubt he would not convict of murder except upon condition·that the punishment should be imprisonment for

life; but that he would convict of murder with the death penalty if there were no doubt at all.

(3) George H. Lee said that he had no conscientious scruples that would prevent him from finding an accused person guilty, but admitted that he had a bias in favor of imprisonment for life and a prejudice against the infliction of death as a punishment for murder, and would not agree to the latter, except in a very extreme case. The opinion expressed by the court in sustaining the challenge of the Government, was that a juror should "come to the question of punishment with an entirely unbiased mind; that the minds of the jury should not be biased upon the subject of punishment, but in such state as to be controlled entirely by the circumstances of the particular case."

The contention of the appellant is that objections to jurors, as stated above, are no longer tenable because of the change in the statute punishing murder, which requires the sentence to be imprisonment for life, instead of the death penalty, in case the jury shall, in their discretion, qualify their verdict of guilty by adding the words, "without capital punishment." See act of January 15, 1897 (29 Stat. 487).

This statute commits to the sound discretion of an impartial jury the exercise of the power to compel the court to substitute imprisonment for life for the death penalty in the sentence for murder. The first question for decision is, guilty, or not guilty, as charged. If the verdict be guilty then the sentence of death will follow, unless the qualification authorized by the statute shall be added to that verdict.

The paramount interest of organized society in the preservation of peace and order would seem to require that the jury should, as far as practicable, be composed of men qualified to determine the first question fairly and without subjection to the influence of a bias or prejudice in respect of the nature of the punishment to follow. See *Logan* v.

*United States,* 144 U. S. 263, 291. We do not regard the question, however, as one that must necessarily be passed upon at this time. In the process of impaneling the jury, the talesmen are examined by and in the presence of the court touching their qualifications. Qualification is a question of mixed law and fact submitted to the sound discretion of the court, and the exercise of that discretion ought not to be disturbed, unless there be disclosed manifest error to the prejudice of the accused. *Connors* v. *United States,* 158 U. S. 408, 413; *Garlitz* v. *State,* 71 Md. 293, 301; *Howgate* v. *United States,* 7 App. D. C. 217, 236.

An accused person brought to trial acquires no vested right to have a particular member of the panel sit upon the trial of his case, until, at least, he shall have been accepted and sworn. What the accused is entitled to is a trial by an impartial jury duly qualified and impaneled to sit thereon. That the appellant had such a jury is not denied. No objectionable person was forced upon him; his peremptory right of challenge was not exhausted. Assuming, however, that error may have been committed in excluding the three talesmen, what legitimate purpose would be subserved by reversing the judgment and remanding the case for trial before another impartial jury? 1 Thompson on Trials, Sec. 120; *Hayes* v. *Missouri,* 120 U. S. 68, 71; *Spies* v. *Illinois,* 123 U. S. 131, 168.

2. The second assignment of error is on an exception taken to the action of the court in permitting John F. Kelley to be called as a witness by the prosecution. This witness was a lieutenant of the police, and was named in the list of witnesses served upon the prisoner as residing at 31 G street N. W., in the city of Washington. It appears that he had been upon the police force as a lieutenant for more than thirty years, and for twenty-seven years had resided at the address above given; but that he had removed to another place in the city about ten days before the service of the list. When the witness was called, the defendant objected

to his being allowed to testify because of this error in naming his abode. The objection is founded on section 1033, Revised Statutes, which provides, among other things, that in a capital case a list of the witnesses to be produced on the trial for proving the indictment, stating the place of abode of each witness, shall be delivered to the accused two entire days before his trial. This is a substantial re-enactment of the act of April 30, 1790 (1 Stat. 118).

This statute preserves an important right to the indicted party. Its purpose is to enable him to inquire into the testimony that he will be called on to meet, and to enable him to prepare for his defense. In its general purpose and effect as a shield of defense, the statute is unquestionably mandatory upon the Government. *Logan* v. *United States*, 144 U. S. 263, 304. At the same time reasonable limitations upon its letter and operation have been recognized in that its benefits may be waived expressly, or impliedly by failure to make seasonable objection. *Hickory* v. *United States*, 151 U. S. 303, 308.

And again, whilst it would in general be the safer practice, where the statute is invoked, to postpone the trial for a time sufficient to give a new notice curing the defects of the original, we are of the opinion that there may be special circumstances so apparent and so plainly exceptional as to create a situation obviously beyond the limits of the contemplated purpose and operation of the statute. It is apparent from the record in this case that the failure to give the correct place of abode in the city, which the statute contemplates, was the result of a natural mistake.

In the second place, it is very clear that the appellant knew well who the witness was and how he might be found and was not in the slightest degree deceived by the error in the abode as given. The record shows, also, after settling the fact of the witness' abode at a place different from that stated in the notice, the following colloquy between the court and the counsel for the defendant: "The Court. Do you

mean to state to the court that you have looked up the
number that was given you as Lieutenant Kelly's address
and could not find him, and therefore you are surprised?
Do I understand you to say that?   Counsel. I do not care
to make any statement on that point at all, unless you de-
mand it of me.    The Court. If you will make this statement
it will have a very material effect upon the court's decision.
Counsel. Then I would like to be relieved from making any
statement in that regard; when the time comes for proof we
can dispose of it in that way.   The Court. What proof?
Counsel. Proving whether we did or did not make inquiry
and what the result was.    The Court. There must be good
faith exercised towards the court, and therefore if you say to
the court that you consulted this number and could not
ascertain who this witness was, and therefore it is a surprise
to you when he comes on the stand, then the court's ruling
would be very different."

We can not give our consent to a construction of the
statute that would make it applicable to the facts and cir-
cumstances above stated and thereby necessitate the reversal
of the judgment.

3. The third assignment of error is founded on exceptions
taken to the latitude permitted to the prosecution in the
examination of defendant's witness, Dr. J. A. Stoutenberg.

The bill merely states that the witness testified on behalf
of the defendant to the opinion that the defendant was in-
sane.   In his cross-examination the witness was asked if he
had heard of Dr. John P. Gray, who had been for thirty
years medical superintendent of the New York State Lunatic
Asylum, and that he had testified on the trial of Guiteau.
Having replied in the affirmative, he was further asked if
Doctor Gray had there stated whether he believed in moral
insanity.

Defendant objected on the ground that the witness had
stated that he had not appeared as an expert in any mean-
ing of the term.   Several pages of the record present the

15 Ct. App.—22

statements of the respective counsel and the remarks of the court on the point, and from this it appears that in reply to the foregoing objection the counsel for the Government asserted that Doctor Stoutenberg had been interrogated concerning his experience in the treatment of insanity and his having given testimony in many cases of inquiry into the mental condition of persons confined in the asylum of which the witness' father is intendant; the purpose having been to show that witness had some technical knowledge of the subject. It was also stated that witness had spoken of the existence of moral insanity. Defendant's counsel then stated that he objected to putting to this witness a question that was asked Doctor Gray in the Guiteau case. The court then ruled that the question might be stated, and counsel read from a report of the trial aforesaid a statement of Doctor Gray upon the subject of moral insanity. The court then held the question as asked objectionable because it assumed that Doctor Gray did actually testify to that effect.

In the course of further argument counsel for the defendant objected that the object "was to get Doctor Gray's evidence in the case by assuming that he said something at some time under such and such circumstances, when we do not know what the circumstances were, thus assuming that he said something there is no proof of." Counsel for the Government then stated that he would read Doctor Gray's statement defining moral insanity to the witness and inquire if he agreed therewith. The court then, after further remarks by counsel, stated: "I do not care anything about the volume or what has been read. What I am deciding upon is the definition of moral insanity; whether the witness agrees with that definition."

The following question was then asked the witness:

"Q. It is said that Doctor Gray, in explaining what the term moral insanity signified, used this language: 'It is intended to signify a condition of perversion of the moral faculties or moral character of the individual, leaving the

intellectual faculties still sound. Inasmuch as I in my own view can not conceive of any moral act or the exercise of any moral affection without an intellectual operation or mental action accompany it, so I can not possibly dissever this mental unity. I look upon man in his mental condition as being a simple unit; that his mental being consists of his intellectual and moral faculties so united that everything he does must spring out of them jointly. Disease is a thing of the body; a sickness of the brain, if it is insanity. No physical sickness could reflect itself through a man's moral nature only.' Do you agree with Doctor Gray in his definition?"

Witness replied: "I can not say that I agree with Doctor Gray."

We can not agree with counsel that Doctor Stoutenberg does not occupy the attitude of an expert. He was a physician, had some experience with lunatics in the asylum of which his father was intendant, and had testified in cases of inquiry into their mental conditions.

It does not appear what his acquirements and experience actually were, nor is their extent of any importance. He expressed opinions that extended into the field of expert testimony, and his modest disclaimer can not avail against that fact.

It must be remembered that the statement referred to occurred in the course of argument before the court and was not a part of the evidence as submitted to the jury, though occurring in their presence. It could have been conducted away from them had counsel so requested. In the light, then, of what was said by the court and the manner in which it actually went to the jury, we can not agree that the purported statement of Doctor Gray as read or repeated was offered or understood to be offered as evidence to contradict Doctor Stoutenberg. The question was propounded to the witness in his cross-examination for the purpose of testing his knowledge of the subject of insanity, and

it was immaterial whether it was read or stated by counsel. Considerable latitude of cross-examination is often important to the discovery of the truth under such circumstances; and its range is within the sound discretion of the court, the exercise of which will not be reviewed save in case of abuse. *Davis* v. *United States,* 165 U. S. 373, 176, 377; *Conn., etc., Ins. Co.* v. *Ellis,* 89 Ill. 516, 519. See, also, *Davis* v. *Coblens,* 12 App. D. C. 51, 53: S. C., 174 U. S. 719, 726; 8 Encyc. Pl. and Pr. 767.

The bill of exceptions is faulty in that it does not present concisely and distinctly the very point as decided by the court. Ascertaining it as correctly as we have been able to do from the stenographic report of the contentions and assertions of counsel, respectively, together with the statements of the court, which are contained in more than four pages of the printed record, we have discovered no abuse of discretion that can be treated as reversible error.

4. The exclusion of the evidence of John Hancock, a witness for the defendant, is made another ground of error. The witness was a nephew of the defendant and confessedly not an expert. He was offered to prove that he did not consider the prisoner in his right mind, and also that he had years ago received a severe blow on the back of the head which had rendered him unconscious for some hours. No facts or circumstances were stated or offered to be proved by the witness upon which his opinion in respect of the prisoner's mental condition had been founded, and the court upon objection excluded the opinion, but let the fact of the receipt of the blow stand.

In this there was no error. *Taylor* v. *United States,* 7 App. D. C. 27, 36; 12 Encyc. L. 489 (2d Ed.).

5. The next assignment of error is upon an exception taken to a hypothetical question submitted to Dr. John B. Chapin, an expert witness called on behalf of the Government.

The statement submitted to the expert witness, upon

which he was asked to express an opinion as regards the insanity of the defendant, presented substantially the facts descriptive of the homicide and the conduct and declarations of the defendant immediately thereafter that had been offered in evidence by the Government—facts, too, about which, it may be added, there was no dispute. Objection was made because the question did not cover all of the facts, or the assumed facts of the case. Counsel was then asked by the court to add what had been omitted. After some further colloquy, defendant's counsel made a statement of some additional facts concerning defendant's conduct after he had been taken to the Emergency Hospital, under a mistaken apprehension that he had taken poison, and some of his actions and statements after removal from there to the police station, and suggested that there were some other facts which he did not specify. He was then requested to frame a question, which he declined to do.

The court then ruled as follows: "The question embraces the substantial facts as offered by the Government, and if there are any facts that the defendant thinks are material and might affect the witness' opinion, that is a matter which he can test on cross-examination. As I understand the hypothetical questions, they must embrace the general statement as proven on the part of the Government. I think the question is sufficient, and the objection is overruled." The witness then expressed the opinion that the defendant was sane. He was not cross-examined by the defendant.

Questions of this nature must be fairly framed with reference to the facts that have been offered and relied on in the evidence, and the hypothesis must be clearly and distinctly presented, so that there may be no misunderstanding by the witness and no confusion of the minds of the jury. Beyond this it would seem impracticable to frame a general rule applicable alike to all cases.

Having in view the particular facts and circumstances of the case, it has often been held that "hypothetical questions

to an expert witness may be framed either upon all the facts in the case, or upon any part of the facts assumed to be true which is sufficient in itself." 8 Encyc. Pl. and Pr. 755, and cases cited; 1 Thompson, Trials, Sec. 610.

Again, in other cases, it would be proper to require the question to embody substantially all of the facts of the entire case, having any relation to the subject matter. 8 Encyc. Pl. and Pr. 576.

One case might admit of, or even require, the separation of the facts in evidence, and assumed for the purpose to be true, into one or more groups for the purpose of an opinion by the expert; the opinions, when given, being for consideration or rejection by the jury as they may consider the assumed facts to be true or untrue.

In a well considered case in Indiana it was held that the question might be framed upon the hypothesis of the truth of all of the evidence, or upon a hypothesis specially framed upon certain facts assumed to be proved for the purpose of the inquiry. *Goodwin* v. *State*, 96 Ind. 555. And the same rule has been applied in New York. *Cole* v. *Fall Brook Coal Co.*, 159 N. Y. 59, 68.

In Michigan it was held, for reasons cogently stated in the opinion, that a question embodying all of the facts in evidence in that case would be objectionable, because of their complicated character and the probable confusion that would ensue. *People* v. *Brown*, 53 Mich. 531, 534.

In a case in a Circuit Court of the United States the length of the hypothetical statements were urged as objections to their admissibility, but the objections were overruled. In affirming the judgment, the Supreme Court said: "The witnesses do not appear to have been confused by their length; they expressed no inability to fully comprehend them. Nor did the court, though complaining of their length, indicate that they were unintelligible to the jury, or tended in any way to turn their minds from the point in issue." *Forsyth* v. *Doolittle*, 120 U. S. 73, 77.

The numerous decisions upon questions of this character demonstrate the propriety of leaving the scope and limitation of hypothetical questions, that must depend largely upon the special circumstances of each case, in a very great degree, to the discretion of the trial court.

This is the conclusion of the Supreme Court of the United States expressly stated in the decision last cited. 120 U. S. 78.

We see no evidence of an improper exercise of discretion in the action of the court upon which the error has been assigned.

6. In considering the assignments of error founded on the general charge of the court, we think it is neither necessary nor important to set out the portions of that charge that were excepted to.

It is sufficient to say: (1) As regards the defense of insanity, the court gave each of the special instructions prayed on behalf of the defendant; and there is nothing in the general charge in conflict therewith. In its definition of insanity as a defense against conviction of crime it follows the established authorities, and has application to the facts of the case. See *Taylor* v. *United States,* 7 App. D. C. 27, 43 ; *Davis* v. *United States,* 165 U. S. 373, 378.

(2) The charge is not subject to the assignment of error, that it did not submit to the jury the right to find the defendant not guilty upon the Government's case, irrespective of the defense of insanity. The jury were plainly told that they could find the defendant not guilty, or not guilty by reason of insanity, or guilty of manslaughter.

That the right to make the first finding received nothing but bare mention is due to the facts showing the commission of the homicide and the character of the defense made. The bill of exception shows that no evidence was introduced in denial of the Government's evidence as to the commission of the homicide, and recites that upon the close of the Government's case the defendant's counsel stated to the court

that the defense was insanity and then proceeded to exam-
ine witnesses on that issue alone.

Moreover, the exception as taken does not show that the
attention of the court was specially called to any omission of
detail in that regard.

(3) In regard to the finding of manslaughter the jury
were told : " You could find him guilty of manslaughter—
that is, it is in your power to so find him ; but I scarcely
think, looking at the law and evidence in this case, that
there is any reason to suppose that you would find a ver-
dict of guilty of manslaughter." The error, if any, was in
mentioning the offense of manslaughter at all.    As was said
in a case by the Supreme Court, where, as here, the defense
was insanity : " There was no testimony to reduce the
offense, if any there was, to manslaughter.    If the defendant
was sane and responsible for his actions, there was nothing
upon which any suggestion of any inferior degree of homi-
cide could be made, and therefore the court was under no
obligation (indeed it would simply have been confusing the
minds of the jury) to give any instruction upon a matter
which was not really open for their consideration." *Davis*
v. *United States,* 165 U. S. 373, 378 ; *Sparf* v. *United States,* 156
U. S. 51, 103.

Had the evidence required a statement of the law of man-
slaughter to be given to the jury, then an expression of
opinion as made would have been improper.    As applied
here, however, it was but telling the jury that the evidence
in the case would not justify a verdict of guilty of man-
slaughter ; and this was the correct view of the entire testi-
mony.    The defendant was guilty of murder or nothing.
See, also, *Allen* v. *United States,* 164 U. S. 492, 495, 496.

8. The last assignment of error is on the refusal of the
court to give this instruction, requested by the defendant:

" Each juror should decide for himself upon his oath as
to what his verdict should be.    No juror should yield his
deliberate conscientious convictions as to what the verdict

should be, either at the instance of a fellow juror or at the instance of a majority. Above all, no juror should yield his honest convictions for the sake of unanimity or to avert the disaster of a mistrial."

This instruction does not correctly state the duty and obligations of a juryman, and was properly refused. *Allen* v. *United States,* 164 U. S. 492, 501.

Having not been able to find any reversible error in the proceedings in this case, the judgment appealed from will be affirmed. *Affirmed.*