Rhozier T. BROWN, Jr., Appellant,

v.

UNITED STATES of America, Appellee.

John D. IRBY, Appellant,

v.

UNITED STATES of America, Appellee.

Robert L. JONES, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 19890–19892.

United States Court of Appeals District of Columbia Circuit.

Argued Sept. 28, 1966.

Decided Dec. 30, 1966.

Petition for Rehearing En Banc Denied Feb. 13, 1967.

Certiorari Denied June 12, 1967. See 87 S.Ct. 2133, 2134.

Edgerton, Senior Circuit Judge, dissented.

**2.** Compare Minor v. Washington Terminal Co., 86 U.S.App.D.C. 71, 180 F.2d 10 (1950); Vale v. Bonnett, 89 U.S.App.D.C. 116, 191 F.2d 334 (1951).

**312**

Mr. M. Michael Cramer, Washington, D. C., with whom Mr. H. Thomas Sisk, Jr., Washington, D. C., (both appointed by this court) was on the brief for appellant in No. 19890.

Mrs. Dovey J. Roundtree, Washington, D. C., (appointed by this court) for appellant in No. 19891.

Mrs. Jean F. Dwyer, Washington, D. C., (appointed by this court) for appellant in No. 19892.

Mr. Theodore Wieseman, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and Joel D. Blackwell, Asst. U. S. Attys., were on the brief, for appellee.

Before EDGERTON, Senior Circuit Judge, and FAHY and BURGER, Circuit Judges.

FAHY, Circuit Judge:

At a joint trial[1] the three appellants were convicted of first degree murder in violation of those provisions of D.C.Code § 22–2401 which defined that crime to include the killing of another in perpetrating or attempting to perpetrate an offense punishable by imprisonment in the penitentiary. Appellants were convicted of killing Lonnie Page in perpetrating or attempting to perpetrate the offense of housebreaking, defined and its punishment by penitentiary imprisonment prescribed in D.C.Code § 22–1801. They were also convicted of housebreaking. The jury was not agreed on the punishment for the murder, and this required the court to sentence the appellants either to death or imprisonment for life, as provided in D.C.Code § 22–2404 (Supp. V, 1966). Sentences of life imprisonment were imposed. We affirm.

According to evidence at trial deceased had been engaged in buying and selling stolen property. On October 2, 1964, he was found dead on the kitchen floor of the house in which he lived. There were three bullet wounds in his body. The house appeared to have been ransacked. Television sets and other articles had been gathered near the front door, and milk had been spilled on the floor in the room where the body lay, the significance of which will appear.

Evidence of how the fatal shooting of Page occurred was supplied by the testimony at trial of Willie B. Whitmire, a participant in events surrounding the homicide. He testified that he and the three appellants, the latter armed, met in the early morning of October 2 at the house of appellant Irby. They drove to an alley near the home of Page and waited until Page left. They then broke into the house. Whitmire took up station at the back door as a lookout while appellants gathered television sets and radios and placed them near the door. In the midst of these activities Page was seen returning. Appellant Brown sent Whitmire to another room to prevent a little girl who was there from saying anything. She had already been tied and a pillowcase had been slipped over her head, which prevented her from seeing Whitmire. He put his hand over her mouth.

---

1. The appeals have been consolidated in this court.

As Page entered through the back door appellant Brown accosted him. Page threw a container of milk. Page was then shot several times. Whitmire ran out the front door to the car. Appellants Brown and Jones followed. Irby ran a different way.

■ The occurrences thus described in the testimony of Whitmire as an eye witness were corroborated by physical details otherwise in evidence,[2] and support the verdicts based on the conclusion that the shots about which Whitmire testified caused the wounds of which deceased died.

This testimony of Whitmire was objected to on the ground that the police learned of him and his possible participation in the homicide through statements made to the police by appellant Brown during his unlawful detention. It is contended accordingly that Whitmire's evidence was inadmissible under the "fruit of the poisonous tree" doctrine.[3]

■ The trial judge held a hearing, without the jury being present, to enable the judge to rule upon this objection to Whitmire's evidence. He overruled the objection. Aside from a question as to the standing of appellants Irby and Jones to press an objection to evidence said to be the fruit of the unlawful detention of someone other than themselves, see Wong Sun v. United States, 371 U.S. 471, 491–492, 83 S.Ct. 407, 9 L.Ed.2d 441, we are clear that Whitmire's live testimony from the witness stand at trial in November 1965 was admissible even if Whitmire's involvement were first learned from an inadmissible statement of Brown made in October 1964.

In Wong Sun v. United States, supra at 487–488, 83 S.Ct. at 417, the Supreme Court held that narcotics, obtained by officers as the result of a statement made by an accused consequent upon the unlawful invasion of his bedroom, were inadmissible at his trial. However, the Court stated that the case was not one,

in which the connection between the lawless conduct of the police and the discovery of the challenged evidence has "become so attenuated as to dissipate the taint." Nardone v. United States, 308 U.S. 338, 341 [60 S.Ct. 266, 84 L.Ed. 307]. We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt, 221 (1959). We think it clear that the narcotics were "come at by the exploitation of that illegality * * *."

In another aspect of the same case the Court held that when an illegal arrest was followed by release of the arrestee on his own recognizance, after his "arraignment," and he had voluntarily returned several days later to make a statement, "the connection between the arrest and the statement had 'become so attenuated as to dissipate the taint.'" Id. at 491, 83 S.Ct. at 419.

2. A little girl, who was present at the time of the murder, was released from her bonds by a neighbor. An officer who arrived at the house shortly after the murder and an occupant who returned home later that day testified that they observed the ransacked condition of the house, spilled milk, and articles gathered at the door. A neighbor who was disturbed by a commotion she heard in the Page house observed three men flee in one direction. Whitmire was able to diagram and describe Page's house rather accurately, and the jury had before it a picture and police diagram of the house. On cross-examination it was elicited that Whitmire had not returned to the house since the crime; no attempt was made to determine if he had been there before the crime.

3. Appellant Irby also gave a statement to the police, but at trial he did not object to Whitmire's testimony as the fruit of his statement. Though the statement implicated Whitmire, the police had already learned of his implication through the statement of Brown.

The "attenuated taint" doctrine, expressed in Nardone, has been applied by this court in Gregory v. United States, 97 U.S.App.D.C. 305, 231 F.2d 258, and, more importantly, in Smith v. United States and Bowden v. United States, 117 U.S.App.D.C. 1, 324 F.2d 879. In *Smith* and *Bowden* the testimony of an eyewitness to a murder and robbery was objected to on the ground that the witness' existence and identity were learned by the police from statements of the two defendants made during their illegal detention. The trial court, with the subsequent approval of this court, ruled that the statements of the defendants were inadmissible. However, relying in part upon Payne v. United States, 111 U.S.App.D.C. 94, 294 F.2d 723, this court pointed out that a living witness, unlike an illegally seized inanimate object,

is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give. The uniqueness of this human process distinguishes the evidentiary character of a witness from the relative immutability of inanimate evidence.[4]

Whitmire's testimony was given some 13 months after the police learned from Brown of Whitmire's complicity. In the circumstances of the case this intervening period, with the impact upon Whitmire of innumerable incidents and his mental processes of thirteen months, attenuate any taint which might have existed originally. *Cf.* United States v. Bayer, 331 U.S. 532, 540, 67 S.Ct. 1394, 91 L.Ed. 1654.[5] Whitmire was an individual personality as distinguished from an inanimate and immutable object illegally come by. The testimony from his own lips, given more than a year after Brown's statement, cannot be said to be the unattenuated fruit of that statement rather than the fruit of his own reflection and volition. It is only reasonable to attribute it to the latter. Acquisition by the police of knowledge of his participation is one thing. His testimony is another and quite different thing. His examination at trial, together with all the circumstances appearing from the record, demonstrate that his testimony is not so closely related to Brown's statement as to be poisoned by its taint.[6]

---

4. Smith v. United States and Bowden v. United States, supra, 117 U.S.App.D.C., at 3–4, 324 F.2d at 881. *Cf.* McLindon v. United States, 117 U.S.App.D.C. 283, 329 F.2d 238; and Smith v. United States and Anderson v. United States, 120 U.S.App.D.C. 160, 344 F.2d 545.

5. In *Bayer* defendant Radovich confessed after being held by military authorities for twenty-seven days without charges. Six months later he again confessed. During the interim between confessions defendant was restricted to his base and talked with F.B.I. agents on several occasions. At trial in the District Court only defendant's second confession was adduced. The Court of Appeals, held it to be "patently the fruit of the earlier one" and reversed defendant's conviction. The Supreme Court assumed the first confession to be inadmissible under McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, but reversed the Court of Appeals stating:
   Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed. The *Silverthorne* [Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319] and *Nardone* cases, relied on by the Court of Appeals, did not deal with confessions but with evidence of a quite different category and do not control this question.

6. Unlike the limited source of the identity of the witness in *Smith* and *Bowden*, Brown himself told Whitmire the police were looking for him. Whitmire and his wife left for Massachusetts, but an aunt, who lived in Washington and knew the police were looking for him, called Massachusetts and informed either Whitmire or his wife—the record is unclear on this

A careful reading of Whitmire's account from the witness stand, given on direct and on a cross-examination which did not undermine its independent character, discloses a witness who desired of his own volition to state what occurred insofar as within his knowledge and remembrance.

■ It is suggested that Whitmire's testimony resulted from pressure of the police or prosecuting officials. This was not pursued at trial on the theory his testimony was inadmissible as though it were an involuntary confession. The matter was pursued evidently to weaken or destroy Whitmire's credibility, and in the effort to take the case out of the ambit of *Smith* and *Bowden*. Although Whitmire denied any promise or inducement and none was proved there are the known circumstances that he had not been charged as were appellants, and had not been retained in custody. Appellants' suspicion that some understanding existed that Whitmire might not be prosecuted, or that he believed he would not be, is not enough to exclude his testimony. On the contrary, we conclude with confidence that he testified as one who of his own volition desired to state what he knew. If the case is unusual Whitmire's testimony is not for that reason inadmissible.

■ The appellants Irby and Jones, but not Brown, seek reversal because of the denial of separate trials. The three appellants were indicted for the same homicide. This was permissible under Rule 8(b), Fed.R.Crim.P.[7] The question, therefore, is governed by Rule 14, applicable notwithstanding the indictment complies with Rule 8(b). Rhone v. United States, 125 U.S.App.D.C. ——, 365 F. 2d 980. Rule 14 provides:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

The application of this rule to a particular set of circumstances rests in the sound discretion of the trial judge:

> The general rule is that persons jointly indicted should be tried together. Granting separate trials is a matter of discretion. * * * Lucas v. United States, 70 App.D.C. 92, 93, 104 F.2d 225, 226 * * *.

Dykes v. United States, 114 U.S.App.D.C. 189, 190, 313 F.2d 580, 581.

■ "Rule 14 * * * restates the common law rule, that a motion for severance was addressed to the trial court's discretion, subject to review only for clear abuse." Robinson v. United States, 93 U.S.App.D.C. 347, 348–349, 210 F.2d 29, 30–31. Cf. Sagansky v. United States, 358 F.2d 195, 199–200 (1st Cir.); Gorin v. United States, 313 F.2d 641,

point—that running was no good. Whitmire also communicated with another friend in Washington, and upon learning that this friend was experiencing some difficulty, returned to the latter's Washington residence where he was apprehended the next day. So many knew of his possible participation in the homicide that his trial testimony is much less closely related to the confession of Brown than that of the witness in *Smith* and *Bowden* to the illegal detention there.

Appellants urge that there has been no intercession of will or volition which would attenuate the taint. Primary reliance is placed on the fact that Whitmire may have been detained for as long as five hours after his arrest and then per-mitted to be at liberty without being charged, but Whitmire denied any promise or inducement, and none was proved. The record does not show how long he was questioned.

**7.** (b) Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.
Rule 8(b), Fed.R.Crim.P.

645–646 (1st Cir.), cert. denied 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052.

■ Common to both Irby and Jones is the fact that in the joint trial of the three appellants Brown defended on the ground of insanity. Irby and Jones assert prejudice in this, emphasized, they urge, by a demonstration of Brown in which he appeared to throw a fit. This occurred just before the first witness was to testify and required suspension of the court proceedings for five days pending a hospital examination of Brown and a report to the court. When the trial resumed no similar episode occurred, but Brown pursued his insanity claim as an alternative to his general defense of not guilty. We find no significant basis in the above for assuming that either Irby or Jones was adversely affected in their trial. The lack of probability of prejudice precludes us from characterizing the conclusion reached at the time by the trial judge as an abuse of his discretion. See United States v. Bentvena, 319 F.2d 916, 930–932 (2d Cir.).

■ Irby and Jones give another reason why each should have had separate trials. Considering this first from the standpoint of Jones, it rests on a suggestion made in the course of trial that the joint trial precluded Jones from calling co-defendants Brown and Irby as witnesses. Jones' counsel referred the trial court to United States v. Echeles, 352 F.2d 892 (7th Cir.), where the denial of a separate trial was found to be reversible error. The facts of our case are quite different from those which persuaded the court in *Echeles*. In the first place, there was no representation to the judge that Jones wished to call either co-defendant as a witness or that he had any reliable basis for desiring to do so. *Cf.* Allen v. United States, 91 U.S.App.D.C. 197, 202 F.2d 329, cert. denied, 344 U.S. 869, 73 S. Ct. 112, 97 L.Ed. 674. In *Echeles* the trial court was presented strong reasons why Echeles wished to call his co-defendant as a witness. Here, it is true, there

is an affidavit filed by Brown prior to trial, accompanying Irby's motion for severance, to the effect that Brown had not seen Irby from the 29th of September 1964 until the 13th of October.[8] However, as we have said, Jones never represented to the court that he wished to call Irby or Brown as witnesses. Assuming, as was held in *Echeles,* that a defendant may not call upon a jointly tried co-defendant to testify, this alone is not sufficient to show prejudice. In fact, the thrust of Jones' requests for severance was not that he wished to have either Brown or Irby as a witness; rather it was the possible adverse effect of Brown's demonstration and insanity defense and the existence of extra-judicial statements made by Brown and Irby which might be admissible. None of these statements was offered in evidence.

The question of severance needs separate analysis in the case of Irby. Well in advance of trial, June 28, 1965,[9] Irby formally moved pursuant to Rule 14, Fed. R.Crim.P., for a separate trial as relief from the allegedly prejudicial joinder of defendants. He asserted in this motion that he contemplated calling as witnesses co-defendants Jones and Brown "to verify and authenticate affidavits copies herein attached, where [sic] completely deny first confessions and repudiate that Irby was involved. Unless, the defendant Irby is tried separately from co-defendants Brown and Jones, it is unlikely that said co-defendants will take the stand." Attached to the motion was an affidavit of Brown which related his version of how a confession had been obtained from him in which he implicated Irby.[10] Somewhat paraphrased, the affidavit stated that he did not commit the crime but in fear of being charged was forced to give the names of John D. Irby and Robert L. Jones, and two fictitious names that he had thought up, thus causing them to suffer as well as himself through falsified information. This motion was argued and denied prior to trial.

8. The homicide occurred October 2, 1964.

9. The trial began in November 1965.

10. The confession was not used at trial.

■ When on the third day of the trial the severance matter was renewed Irby's counsel did not mention the foregoing basis for a separate trial. He made no representation to the court that he wished or intended to use either Brown or Jones as a witness. From the decisions of this court discussing the problem of separate trials,[11] each with its own special facts, there emerge principles which clearly indicate that the present case affords no basis for reversal of Irby's conviction due to his joint trial with Brown and Jones for the same offenses. The bare assertion that he could not call either co-defendant as a witness does not warrant reversal on the theory that if he could he would have done so.

There remains the contention of all appellants that Whitmire's testimony was inadmissible because the United States, it is asserted, failed to comply with Title 18, U.S.C. § 3432, which provides:

> *Indictment and list of jurors and witnesses for prisoner in capital cases.* A person charged with treason or other capital offense shall at least three entire days before commencement of trial be furnished with a copy of the indictment and a list of the veniremen, and of the witnesses to be produced on the trial for proving the indictment, stating the place of abode of each venireman and witness.

Appellants were served with a list of witnesses, including Whitmire, in June 1965, well in advance of the November trial. The address given for Whitmire was then correct. However, he twice changed his place of living before the trial,[12] and defendants were not advised.

■ ■ This is unfortunate, but there is nothing to indicate a deliberate misleading by the United States, or other than a careless mistake; and there was no misleading that could not easily have been remedied by appellants in ample time to avoid any possible prejudice. Brown's attorney did not discover the inaccuracy and so Brown could not have been disadvantaged. As to Irby his attorney knew of the error considerably in advance of trial and made no effort to obtain any additional information from the United States. Indeed, counsel for Brown and Irby did not initiate objection based on the list. When counsel for Jones raised the matter after the trial had been in progress for several days they joined. Jones' counsel asserted that investigators assisting in the preparation of Jones' defense had been unable to locate Whitmire, but conceded knowledge of the situation a week before making the motion and also that she had not sought additional information from the United States. In these circumstances any objection to the failure of the United States to change the address must be deemed to have been waived. Horton v. United States, 15 App.D.C. 310, 319–321 (1899), cert. denied, 175 U.S. 727, 20 S. Ct. 1023, 44 L.Ed. 339; Compare Logan v. United States, 144 U.S. 263, 12 S.Ct.

11. *E. g.*, Matthews v. United States, 115 U.S.App.D.C. 339, 319 F.2d 740, cert. denied, 375 U.S. 943, 84 S.Ct. 351, 11 L.Ed. 2d 274; Dykes v. United States, 114 U.S. App.D.C. 189, 313 F.2d 580, cert. denied, 374 U.S. 837, 83 S.Ct. 1889, 10 L.Ed.2d 1059; Maynard v. United States, 94 U.S. App.D.C. 347, 215 F.2d 336; Stewart v. United States, 94 U.S.App.D.C. 293, 214 F.2d 879; Allen v. United States, 91 U.S. App.D.C. 197, 202 F.2d 329, cert. denied, 344 U.S. 869, 73 S.Ct. 112; Hall v. United States, 83 U.S.App.D.C. 166, 168 F.2d 161, cert. denied, 334 U.S. 853, 68 S.Ct. 1509, 92 L.Ed. 1775; Wheeler v. United States, 82 U.S.App.D.C. 363, 165 F.2d 225, cert. denied, 333 U.S. 829, 68 S.Ct. 448, 92 L.Ed. 1115; Lucas v. United States, 70 App.D.C. 92, 104 F.2d 225; Maxey v. United States, 30 App.D.C. 63.

12. On June 7, 1965 witness lists were served on all three defendants. These lists bore 29 names and addresses, including Whitmire's. On June 10 another list of 5 names and addresses, supplementing the original lists, was served on the defendants. Then on September 16, a list bearing the same five names as those designated on June 10 was received by the clerk. To this list was added the name of one new witness, and the address of one witness was changed from jail to a private residence. It does not appear from the docket that this list was delivered to the defendants though counsel's arguments at trial indicate the contrary.

617, 36 L.Ed. 429 (1891). In any event the omission furnishes no basis for reversal, for there is no showing whatever of prejudice.[13]

In connection with Brown's defense of insanity, the government countered the expert testimony adduced by the defense with other expert testimony. Two government doctors testified that in their opinion Brown was malingering. Appellant does not challenge the admissibility of the doctors' opinions, which were based in part on their own examinations of appellant and in part upon conduct of Brown observed and reported to the doctors by members of their staff. It is urged that one of the doctors' testimony in support of his medical opinion was incompetent and hearsay and so prejudicial as to require a new trial.[14] We have carefully considered the record pertinent to this contention. The data upon which the doctor partially relied comes within the ambit of Jenkins v. United States, 113 U.S.App.D.C. 300, 304, 307 F.2d 637, 641:

> [W]e agree with the leading commentators[6] that the better reasoned authorities admit opinion testimony based, in part, upon reports of others which are not in evidence but which the expert customarily relies upon in the practice of his profession.[7]

6. McCormick, Evidence § 15 (1955). See 3 Wigmore, Evidence § 688 (3d ed. 1940).

7. Taylor v. Monongahela Ry., 155 F. Supp. 601, 604 (W.D.Pa.1957), aff'd

13. *Cf.* McNabb v. United States, 123 F.2d 848 (6th Cir.), rev'd on other grounds, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819; Holmes v. United States, 56 App.D.C. 183, 186, 11 F.2d 569, 572; Shaffer v. United States, 24 App.D.C. 417, 432–433, cert. denied, 196 U.S. 639, 25 S.Ct. 795, 49 L.Ed. 631. Defense counsel not only received the witness list 5 months in advance of trial rather than the required three days, but their objection is also weakened by the fact that they had an opportunity to cross-examine Whitmire when the trial judge held a hearing out of the presence of the jury on the issue of the admissibility of Whitmire's testimony.

per curiam, 256 F.2d 751 (3d Cir. 1958); Sundquist v. Madison Ry., 197 Wis. 83, 221 N.W. 392 (1928); Schooler v. State, 175 S.W.2d 664 (Tex.Civ. App.1943).

In forming an expert opinion it may be necessary to rely upon information—hearsay though it be—which in part is derived from persons charged with the supervision of the one whose conduct is involved. The information is winnowed through the mental processes of the expert, and is by him either accepted or rejected. If information such as is here challenged is accepted as useable by the doctor it is not so liable to be untrustworthy as to require the court to rule that his opinion is unworthy of consideration by the jury. The witness having used the information it was not error to permit him to state what it was. In any event, in the context of the witness' testimony as a whole, the matter would not be serious enough to warrant reversal even were we to assume *arguendo* that the information should have been withheld from the jury.

Affirmed.

BURGER, Circuit Judge, (concurring):

I concur fully in Judge Fahy's opinion, but it seems to me note should be taken of what I consider a misreading of my opinion in Smith and Bowden v. United States, 117 U.S.App.D.C. 1, 324 F.2d 879 (1963). The dissent seems to view each fact and factor recited in that opinion as critical and decisive to the holding.

14. After stating that Brown was malingering, the doctor offered to give a "dramatic" example. Defense counsel objected unless the doctor saw the incident. The doctor, after the court's ruling, stated that he examined Brown and found him stiff and unresponsive on the day of his fit, but that evening a senior nursing assistant noted that appellant was first in the "chow line." Upon entering the dining room appellant was greeted by name and asked "What are you doing back?" Appellant winked and passed on. The doctor also described appellant's treatment and progress until his return to the court.

Of course, that is not so. For example, it was never intended in *Smith-Bowden* to suggest that the time factor for the interaction of "will, perception, memory and volition" was significant. This interaction in one case may occur in 10 seconds or 10 minutes; in another it may be 10 months, depending upon myriad factors not relevant to the decision to testify. The critical aspect of *Smith-Bowden* is that live witnesses are not "suppressed", as inanimate objects may be. When an eyewitness is willing to give testimony, under oath and subject to all the rigors of cross-examination and penalties of perjury, he must be heard. How he came to be in court is a matter which goes only to the weight, not the admissibility, of his testimony.

EDGERTON, Senior Circuit Judge (dissenting):

The police got statements from Brown and later from Irby which revealed that Whitmire took part in the murder of Page. The Government did not offer these statements in evidence and does not deny that they were inadmissible under the *Mallory* rule. The principal question in these appeals is whether the court erred in admitting Whitmire's testimony.

The Government does not contend that it could have learned of Whitmire's presence and participation without the information illegally obtained from Brown.[1] On the basis of that information the police issued a lookout for Whitmire and on October 21 obtained a warrant for his arrest.[2] Brown informed Whitmire that Brown had confessed and had disclosed the names and addresses of all concerned in the murder, including Whitmire. Whitmire told his wife and they fled to New York and Massachusetts.

Whitmire came back at the request of a woman friend who telephoned him that she was "having difficulties." He made no effort to contact the police. On October 22 they arrested him in the early afternoon at the woman's house, told him he was charged with murder, and questioned him, holding him for some five hours without taking him before a commissioner.[3] At first he denied knowledge of the crime, but after further questioning, he not only confessed but agreed to testify for the prosecution. The police then released him. The next day the warrant for his arrest was cancelled. Though a coroner's jury named him on October 28 as one of those responsible for the murder, he was never charged.

Apparently Whitmire never wavered in his intention to testify for the prosecution. He kept in touch with the police during the period of about a year that elapsed before the trial. As the Government says, "although he never surrendered, he surely accommodated the police in every way." The Government concedes that its case rested on the testimony of this accomplice. The District Court noted the lack of probative value of other testimony.

This court thinks Whitmire's testimony did not result from "exploitation of the primary illegality" and therefore was admissible; that the connection between the *Mallory* violations and Whitmire's testimony was "attenuated." To me that connection seems both clear and direct. If so, this testimony should have been excluded as a "fruit of the poisonous tree."

The principal question in *Smith* and *Bowden* v. *United States* was whether Holman's testimony should have been excluded because the confessions of Smith and Bowden, which implicated Holman, were obtained in violation of the *Mallory* rule. When the police first located Hol-

---

1. It does make this contention with regard to the information afterwards obtained from Irby. But the police first identified Irby himself as a participant in the crime only through Brown's statement, and whatever knowledge they had of Whitmire before Irby confessed was also a result of Brown's statement.

2. I think it immaterial that after these events, and because of them, many knew of his possible participation in the homicide.

3. This was a third *Mallory* violation.

man he said nothing adverse to Smith and Bowden. It does not appear that he decided to say anything adverse to them until the case was tried five months later. We held that "the relationship between the inadmissible confessions and Holman's testimony in the District Court months later is so attenuated that there is no rational basis for excluding it." In explanation we said: "the living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give." We recognized by clear implication that this interaction takes time. We said: " * * * when initially located Holman gave no information adverse to appellants; *only after reflection and the interaction of these faculties of human personality* did Holman eventually relate to the jury the events of the night of the killing." Smith and Bowden v. United States, 117 U.S.App. D.C. 1, 3 & n.2, 324 F.2d 879, 882 & n.2 (1963) (emphasis added).

The present case is very different. Whitmire tried to avoid arrest and professed innocence when first questioned. His decision to abandon that position, confess, and become a government witness was not made, as Holman's was, "after reflection." It was made only a few hours after he was arrested and while he was still in custody. To me it seems clear that Whitmire's arrest, which resulted directly from the illegally obtained statements of Brown and Irby, led directly to his decision to become a Government witness. When he made this decision he had had no appreciable opportunity, after his arrest, for "reflection" and for "attributes of will, perception, memory and volition [to] interact to determine" how he would testify. That he had ample opportunity afterwards and before the trial seems to me immaterial, since this opportunity did not result in any alteration of the decision he had previously made.[4]

Since this case does not seem to me to be within the *Smith and Bowden* exception to the rule which excludes "fruit of the poisonous tree," I would apply that rule and reverse. I intimate no opinion about other points in the case.

---

4. Whitmire testified that he made his statement to the police "to clear his conscience." His testimony that the police made no promises, however improbable it may be, cannot be ignored as incredible.