# SHAFFER v. UNITED STATES.*


CRIMINAL LAW; HOMICIDE; EVIDENCE; PHOTOGRAPHS AS EVIDENCE; LEAD-
ING QUESTIONS; PREJUDICIAL ERROR; HANDWRITING, PROOF OF; LIST
OF WITNESSES FOR THE ACCUSED; INSANITY; EXPERT TESTIMONY;
NONEXPERT TESTIMONY.


1. Photographs are admissible in evidence to enable witnesses to establish
the identity of persons and places.

2. The photographing by the government of one accused of homicide while
he is in custody, for the purpose of using the photograph at the trial
as a means of identification, does not violate the constitutional principle
that a party cannot be required to testify against himself, or to fur-
nish evidence to be so used, where no excessive force or illegal duress
is employed in taking the picture; and the photograph so taken may
be used on the trial to identify the accused, in the examination of a
witness who, until it is produced, is unable to identify him.

3. Whether a question is leading depends upon the circumstances under
which the examination of the witness has been conducted, and the
fact that it is a leading question does not necessarily make it ob-
jectionable.

---

*Handwriting.*—As to procedure in proof of handwriting, see the full
presentation of the authorities in editorial note to *State* v. *Hall*, 65 L. R.
A. 151.   For a similar presentation of the authorities as to limitation of
evidence to handwriting, see editorial note to *State* v. *Ryno*, 64 L. R. A.
303.

For a full *résumé* of the authorities involving a comparison of hand-
writing, see the following editorial notes:   Comparison of handwriting,
note to *University of Illinois* v. *Spalding*, 62 L. R. A. 817; competency of
handwriting as standard for comparison, note to *Gambrill* v. *Schooley*, 63
L. R. A. 427; competency of expert witnesses for comparison of hand-
writing, note to *Tower* v. *Whip*, 63 L. R. A. 937; comparison of marks
and spelling of disputed instrument, note to *Re Hopkins*, 65 L. R. A. 95.

4. Ordinarily the form of a question and the course of the examination of a witness are matters within the discretion of the trial court; and it is only where the appellate court can see that a witness was led by the form of a question propounded him to make an answer prejudicial to the objecting party that such question will be regarded as matter of substantial error.

5. That the trial court erred in overruling an objection to a question as leading, will not be held to be prejudicial error, where the record shows that, in the course of the subsequent examination of the witness, the same fact was elicited as that in answer to the alleged objectionable question.

6. It is not required that a witness testifying to the handwriting of a party should have seen him write, or have corresponded with him; but proof of handwriting may consist of ordinary, circumstantial evidence showing a reasonable probability of the handwriting being that of the party whose handwriting it purports to be.

7. Where, in a homicide case, the list of witnesses for the prosecution furnished the accused, as required by sec. 1033, U. S. Rev. Stat. (U. S. Comp. Stat. 1901, p. 722), contained two identical names, separated by thirty-four intervening names, with nothing to·show whether they were of the same person or of different persons; and it appeared on the trial that the names were of mother and daughter; but there was nothing to show that the accused had been misled or prejudiced by the manner in which the witnesses were named in the list,—it was *held* that it was not error for the trial court to have permitted the daughter to testify against the accused.

8. Under such circumstances, it was also *held* that there was ńo presumption that there was but one person, in fact named twice in the list, but the presumption was rather the other way,—that there were two different persons of the same name living in the same house; and the accused, if he had been in doubt, should have applied to the trial court to require the prosecuting officer to make the necessary correction in the list.

9. A qualified expert is competent to testify in a homicide case, where the defense is insanity, as to his opinion of the sanity of the accused, based upon an examination made two months and eight days after the alleged homicide,—especially where the insanity set up is of a kind claimed by the defense to have existed since the birth of the accused.

10. Where part of the charge of the trial court to the jury is made the basis of assignment of error, the whole charge will be examined and read together to ascertain the import and meaning of the passage excepted to.

11. The question of the competency of a nonexpert witness to express an opinion as to the sanity of the accused in a homicide case is for the court; but, where the witness is held to be competent, the question of the weight and value of his opinion is for the jury.

12. A passage in the charge of the trial court to the jury, in a homicide case in which insanity was the defense, examined, and reviewed in connection with the entire charge, and *held* not to have been erroneous, where, in effect, it told the jury that no weight was to be given to the opinion of a nonexpert witness on the question of insanity, unless that opinion was based upon facts testified to before the jury, and unless the jury entertained the same opinion as the witness on the facts proved before them.

13. Where a case has been fairly tried, over-refined distinctions, or forced application of technicalities, should never be indulged in to defeat the result of such trial.

No. 1477. Submitted November 4, 1904. Decided December 13, 1904.

HEARING on an appeal by the accused in a homicide case from a judgment of conviction of the Supreme Court of the District of Columbia, sitting as a criminal court, on the verdict of a jury finding him guilty of murder in the first degree.   *Affirmed.*

The COURT in the opinion stated the case as follows:

The appellant in this case, Augustus L. Shaffer, was indicted on the 3d day of November, 1903, for the wilful and premeditated murder of his divorced wife, Catharine Shaffer, on the 22d day of August, 1903, on one of the public streets of the city of Washington.   The accused was arraigned and pleaded not guilty, and, upon trial by jury, he was found guilty of murder in the first degree as indicted.   Many exceptions were taken by the accused in the course of trial; and upon sentence that he be hanged, he has taken this appeal.

The crime as charged in the indictment is, that the accused feloniously, purposely, and of his deliberate and premeditated malice, did, on the day named, assault the said Catharine Shaffer, and then and there with a razor inflicted in and upon the right side of the neck of her, the said Catharine Shaffer, one mortal wound of the length of 7 inches and of the depth of ¾

of an inch, of which said mortal wound the said Catharine then and there instantly died.

On the trial, the government proved the homicide as charged, to have been committed on the 22d day of August, 1903. There was no question made as to the commission of the crime by the accused; that was conceded. The accused and the deceased were married in the year 1891, and were divorced upon the application of the wife on the 16th day of April, 1901. By the decree of divorce, the custody of their son, William, was given to the father, and the custody of their daughter to the mother, the deceased. For two or three weeks immediately prior to the homicide the accused had been seen loitering in the neighborhood of the corner of the street which was about half a square from the home of the deceased; and on several occasions during that period had accosted deceased in the street and attempted to induce her to grant interviews with him, which she refused to do. On one of these occasions, after the deceased had refused him an interview, the accused boarded a street car upon which the deceased was riding and rode for some distance thereon while she was on the car. On other occasions, he was seen frequently following her from place to place. On the Sunday night immediately preceding the homicide, he had followed her home, saying, as she entered the house, "God damn you, Kate, wait." Three days before the homicide, the accused had called at about 11 o'clock in the evening, at the house where the deceased lived, and made an unsuccessful effort to see her, after which he loitered in front of the house until about 1 o'clock in the morning. The homicide was committed at or near the southwest corner of Fourth street and Massachusetts avenue, between the hours of 8 and 9 o'clock in the evening. The accused approached the deceased, and said to her, "Kate, it is my time and my chance now." He then seized her with one hand, and cut her throat with a razor. Immediately afterwards, when asked by a bystander, who had approached, why he had done such an act, his reply was that the woman was his wife, and that she had done him dirty, and that he ought to have done this years before, adding an opprobrious

epithet. To another bystander he said, "Go down to her house and tell her people." And to another person, as he was being taken to the station house, he said: "It is done now, and there is no use talking about it; you see that I am not worried." There was evidence tending to prove that prior to the homicide the accused wore no beard; that he wore no beard when a photograph was taken of him at the police station, but that, during the trial, he wore a full beard. There was also given in evidence to the jury the contents of a letter purporting to have been written by the accused to the deceased, about a month prior to the homicide. The letter was written from Beltsville, Maryland, and purported to be in answer to one written by the deceased to her son, Willie, who was with his father at Beltsville. In that letter, purporting to have been written by the accused, the writer said:

I will be home about the 4th of August, and if you do not see me I will fix you in a way you do not like. I do not intend those damned Ivey girls to make a fool of me. You will see where you land.                    Yours, Gus. S.

The original of this letter was shown to have been lost, and there was considerable contest over the effort on the part of the government to prove the handwriting of the accused, in order to establish the genuineness of the letter. Proof, however, was admitted of the handwriting as being that of the accused, and the contents of the letter were allowed to be given in evidence.

At the conclusion of the evidence for the prosecution in chief, the accused offered evidence to support his defense. As we have said, there was no denial of the fact of the commission of the homicide by the accused. His defense was that of insanity at the time of the commission of the act. He offered and gave evidence tending to show that he was by nature easily excitable to passion; that when under the influence of passion he was liable to become incapable of controlling himself; would lose all power to control himself; was liable to do anything, and was a practical maniac; also, that he was addicted to drink, and when under the

influence of excessive drink was similarly liable to lose possession of his senses, and to act in a manner indicating want of control of his will and other faculties; that at the time of the homicide under inquiry, he was greatly intoxicated; and further, that at the time of the said homicide he was of unsound mind and insane.

By a number of witnesses, according to the statement in the bill of exceptions, the accused gave evidence tending to show that said witnesses had known and associated with the accused for various longer and shorter periods of time; in some instances beginning with his boyhood, and continuing down to the time of the trial; that, in general, his conduct was strange and unusual, and in his boyhood he was called by his companions "Looney Shaffer;" and, in his boyhood, and afterwards, was called by some who knew him, "Crazy Gus;" that some of the witnesses had worked and lived in the same house with him before and up to within a short time of the homicide, and that said witnesses observed a number of actions which they characterized as "queer," "peculiar," "eccentric," some of said actions consisting, as they thought, of crazy talk; that he would excitedly wave his arms, seemed to have a grievance for which no foundation appeared; would burst into tears, look in a blank way; would get so rattled that he did not know what he was doing; would repeat orders and give conflicting orders to those employed under him; did odd and unnecessary and inexplicable things in the conduct of his business; had a peculiar look or stare; was at times morose and sullen, and at other times exceedingly violent; talked very disconnectedly at times; had hallucinations as to people following him; and had such hallucinations the night before the homicide; he became wild when he talked about the deceased; and did other acts indicating a peculiar and weak nature; all which several matters and things were narrated to the jury; and that, from the observation and knowledge of the same, the said witnesses testified that they had formed and entertained an opinion that the accused was of unsound mind, and irresponsible for his acts. But some of the witnesses who testified for the ac-

cused, testified that they did not consider, and never had considered, the accused insane.

The prosecution, in rebuttal, offered and gave in evidence by witnesses who testified, that they had known the accused for long periods, and that they never had considered him other than of sound mind; that for six or seven years he was foreman in charge of the delivery station of the Blue Line fast freight, and had charge of the delivery of about 15 carloads of freight per day; and had authority to employ and discharge men, and that there were from 15 to 25 men under his charge. Other witnesses testified that for about two years preceding the homicide the accused was employed in the Government Printing Office, in a position requiring a considerable degree of intelligence, and that he did his work intelligently, faithfully, and well.

*Mr. Henry E. Davis, Mr. Wilton J. Lambert,* and *Mr. D. W. Baker* for the appellant.

*Mr. Morgan H. Beach,* United States Attorney for the District of Columbia, and *Mr. Charles A. Keigwin,* Assistant United States Attorney, for the appellee.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

While there were more exceptions contained in the record, the assignments of error are reduced to six, and they are as follows:

1. That there was error in overruling the appellant's objection to the admission of the photograph of the appellant in evidence, and in permitting the witness, Mary Hoy, to examine said photograph.

2. That there was error in overruling the appellant's objection to the leading question asked the witness Agnes Ivey, as to her knowledge of appellant's handwriting.

3. That there was error in allowing, over appellant's objection, several witnesses to testify as to the contents of a letter alleged to have been written by the appellant.

4. That there was error in permitting, over appellant's objec-

tion, the witness, Miss Georgia C. Ivey, to testify in the case, because not properly named in the list of witnesses required to be furnished the accused.

5. That there was error in permitting, over appellant's objection, Dr. Jelliffe, an expert witness, to give his opinion as to the condition of mind of the appellant on August 22, 1903, based upon an examination made by him about November 1, 1903.

6. That there was error in charging the jury that no weight was to be given to the opinion of a layman on the question of insanity, unless that opinion was based upon facts testified to before the jury, and unless the jury entertain the same opinion as the layman on the facts proved before them.

We shall examine these assignments of error in the order in which they are stated, though the assignments of error are not made in the order of the exceptions taken, as stated in the bill of exceptions.

1. The first of these assignments of error relates to the admission for use in evidence of a photograph of the accused, which was taken by a police officer shortly after the homicide, and while the accused was under arrest. The facts under which the photograph was proposed to be used were these: It had been shown in proof by a witness, Miss Hoy, that she had seen a man loitering in the neighborhood of the corner where the homicide was committed for some time before the killing occurred. She was unable to identify the accused as that man. At the date of the homicide the accused wore no beard on his face but a mustache only, while at the trial he wore a full beard. The witness was shown the photograph, and she recognized it as the picture or photograph of the man she had observed near the corner. To this offer and use of the photograph the accused objected, but his objection was overruled, and the photograph was allowed to be used as proposed, and the witness to testify to the identity of the accused, with the aid of the photograph. The accused excepted to this ruling.

It is conceded that the photograph used at the trial was the one taken by the officer of the accused while the latter was in custody, under arrest for the homicide. It has become the settled

practice of courts to recognize photography as a proper means of producing correct likenesses, both of individuals, and other objects; and therefore photographs are allowed to be produced in evidence to enable witnesses to establish the identity of persons and places,—such proof frequently becoming necessary to enable courts to establish essential facts when other proof might be difficult to obtain. *Udderzook* v. *Com.* 76 Pa. 340. Applying this principle, it has been held that, on an indictment for bigamy, a photographic likeness of the first husband could be shown the witnesses present at the first marriage, in order to prove his identity with the person mentioned in the marriage certificate. *Reg.* v. *Tolson,* 4 Fost. & F. 103. And so in the case of *State* v. *Ellwood,* in the supreme court of Rhode Island (17 R. I. 763, 24 Atl. 782), it was held that a picture of the defendant, taken shortly after his arrest, was admissible to show his appearance at that time, as compared with his appearance at the time of the trial, when he had in the meantime grown a mustache and otherwise changed his personal appearance. And in the case of *Com.* v. *Morgan,* in the supreme court of Massachusetts, 159 Mass. 375, 34 N. E. 458, on a trial for larceny, a witness testified that at the time of the commission of the crime the defendant had side whiskers and a mustache, while certain witnesses for the defendant testified that they had known the defendant since the spring of 1887, and that he had never worn side whiskers. In this state of proof it was held that it was proper to admit in evidence a photograph of defendant to show that when it was taken, in July, 1887, he wore side whiskers. There are many other cases that might be cited to show that photographic pictures are constantly used as means of evidence in courts of justice, and especially on questions of disputed identity.

But we understand the main point of this objection to be that, as the witness produced to identify the accused failed to identify him, it was not competent for the government to place in the hands of that witness a photographic picture taken of the accused by the police officer, after his arrest and while in the custody of the officer, for purpose of identification. In other

words, that the government had no right to photograph the accused while holding him in custody for the purpose of using that photograph to have him identified at the trial. This objection is founded upon the theory that the use of the photograph so obtained is in violation of the principle that a party cannot be required to testify against himself, or to furnish evidence to be so used. But we think there is no foundation for this objection. In taking and using the photographic picture there was no violation of any constitutional right. There is no pretense that there was any excessive force or illegal duress employed by the officer in taking the picture. We know that it is the daily practice of the police officers and detectives of crime to use photographic pictures for the discovery and identification of criminals, and that, without such means, many criminals would escape detection or identification. It could as well be contended that a prisoner could lawfully refuse to allow himself to be seen, while in prison, by a witness brought to identify him, or that he could rightfully refuse to uncover himself, or to remove a mark, in court, to enable witnesses to identify him as the party accused as that he could rightfully refuse to allow an officer, in whose custody he remained, to set an instrument and take his likeness for purposes of proof and identification. It is one of the usual means employed in the police service of the country, and it would be matter of regret to have its use unduly restricted upon any fanciful theory or constitutional privilege.

2. The second assignment of error relates to what is alleged to have been a leading question allowed to Agnes Ivey.

The question was in the following form: "Were your opportunities of examining these orders from the defendant of such a character as to enable you to recognize his handwriting if you saw it again?" Whether this question was leading in its character depended upon the circumstances under which the examination had been conducted; and the fact that it may have been leading did not necessarily make it objectionable. It is only where the appellate court can see that the witness has been led, by the form of the question, to make an answer prejudicial to the objecting party, that such question will be regarded as matter of

substantial error.    Ordinarily, the form of the question and the course of the examination of the witness are matters within the discretion of the court below, not subject to review.    The conduct and intelligence of the witness, as well as the purpose to improperly lead him to make biased and colorable answers to questions, are all matters within the view and observation of the court below; and an appellate court will assume that the court below is best able to regulate and impose the proper restraint upon the examination.    But in the present instance there is no sort of ground for the objection urged.    For, in the course of the subsequent examination of the witness, the same fact is elicited and brought out in distinct form as that in answer to the alleged objectionable question ; and therefore no prejudice could have resulted from the question objected to, but allowed by the court. There was no error in that ruling.

3.  The subjects of the third assignment of error are the rulings of the court in relation to evidence to establish the handwriting of the accused, and the contents of the letter purporting to have been written by the latter to the deceased from Beltsville, Maryland, dated July 26th, (or 27th), 1903.    The handwriting was proved and the contents of the letter (the letter itself having been proved to be lost) were admitted in evidence.    The rulings under which this evidence was admitted were all excepted to by the accused.

It appears from the evidence in the record that in the latter part of July, 1903, the accused was at Beltsville, Maryland, with his little son, Willie, and a friend by the name of Myers. The son's birthday occurred on the 23d or 24th of that month, and about that date the deceased, the mother of the boy, wrote a letter to her son in regard to some small articles which she had procured as presents for him on his birthday.    After the death of the mother, a letter dated from Beltsville, on the 26th or 27th of July, and purporting to come from the accused, was found among her effects.    The material part of this letter has already been stated.    The letter was accidentally lost or destroyed, but not until after it had been read by Mrs. Ivey, the mother of the

deceased, and the two sisters of the deceased, Miss Agnes Ivey and Mrs. Elizabeth Sage.

The government gave evidence tending to prove the finding of this letter among the papers of the deceased, and that it had been lost or destroyed, and that it was in the handwriting of the accused. It was proved that the accused was at Beltsville on the day on which the letter was written or dated; that his son, Willie, and Mr. Myers were with him; that Willie had received a letter from his mother in regard to his birthday presents; and that the letter purporting to be from the accused made reference to all these circumstances, and stated that he intended to return to the city on the 4th of August following, and that he did return on that day.

The contents of the letter being objected to, upon the ground that the letter had not been shown to have been in the genuine handwriting of the accused, nor its contents properly established by competent proof, the government proceeded to show by proof, that the letter was found by Agnes Ivey, a sister of the deceased, about a week after the homicide, in a box of stationery among the effects of the deceased in the room occupied by her for several months prior to her death. The deceased had lived with her mother and sisters up to the time of her death, and there were no other occupants of the house; they kept no servant; and no one else had access to the room. Miss Ivey, immediately upon finding the letter, had taken it to her mother and her sister, Mrs. Sage, who read it, and the letter was left in the custody of the mother. The family were at the time preparing to move to another house, and shortly thereafter did remove. Some months after the homicide, occasion arose to examine the letter, but it could not be found. A very full and exhaustive search was made for it, in every place where the paper might be placed, but without success. Many papers had been destroyed, and among them some that belonged to the deceased. Mrs. Ivey, Mrs. Sage, and Miss Agnes Ivey all testified to the fact of the search, and their inability to find the letter. The other two inmates of the house testified that they had never seen the paper, and there was

no other person in or about the house that could have taken the paper out of its place of deposit.

This proof was certainly sufficient to let in secondary evidence of the contents of the paper, provided the genuineness of the handwriting of the accused be established as that in which the letter was written; and this was a question about which there was severe contest on the part of the accused, the effort being to exclude the evidence offered on the part of the government for that purpose.

The handwriting of the accused was proved by one witness who had seen him write, though in an imperfect way; by two witnesses who had seen writing known to be his, and by the fact that the letter in question bore intrinsic evidence that it was in reply to the prior letter of the deceased, written to the little son then in the care of his father at Beltsville.

Mrs. Sage, a sister of the deceased, and one of the witnesses who had seen the letter after the homicide, swore that she had seen the accused write, that she had seen his writing, and that she knew his handwriting; and that the letter found among her sister's effects after her death, written in July, she read and knew it to be in the handwriting of the accused, and it was left with her mother. But she states that she could recall no particular occasion on which she had seen him write, except one time at a game of cards in which he kept the score; that she could not say that on that occasion he had written any name, but she saw the column of figures which he had written. She further testified that she had seen letters written by the accused to her sister before they were married; and that she, herself, had on one occasion received a letter from him, when she was out of town, in which she referred to a misunderstanding between them, and ho made an apology for some conduct of his which had given her offense.

The witness Agnes Ivey, by whom the letter to the deceased was found after the homicide, but subsequently lost or destroyed, read the letter before it was delivered to her mother, and she testifies that the letter was in the handwriting of the accused. As means of knowledge of his handwriting she testifies that she had

been employed as a bookkeeper at a grocery and bakery at which the accused was in the habit of dealing. To this place he used to send written orders for goods, which orders were filled by the witness and by her charged upon his pass book. The book was always returned to the accused. The book was brought by the son of the accused, who, at that time, was too young to write, and there was no one at the house of the accused except himself who could have written the orders.

The facts as proved by the two witnesses, Mrs. Sage and Agnes Ivey, are, in our opinion, sufficient to constitute the foundation of knowledge to enable each of them to testify to the genuineness of the handwriting of the accused, and that the lost letter was in his handwriting. And as to the proof of the loss or destruction of the letter and of the contents thereof, there would seem to be no room for doubt or question. That proof was amply furnished by the testimony of Mrs. Ivey, the mother of the deceased, and the two sisters, Mrs. Sage and Miss Agnes Ivey. The letter was brief, and they all concur in testifying to substantially the identical terms of it.

It has been earnestly insisted, and many authorities cited to support the contention, that the evidence was not sufficient to let in proof of the contents of the letter. But we think, on the decided weight of authority, that the evidence was amply sufficient for that purpose. It is not required that the witness testifying to the handwriting of a party should have seen him write; knowledge of handwriting may be acquired by other means. Proof of the handwriting of a party may consist of ordinary circumstantial evidence, showing a reasonable probability of the writing having been made by the person purporting to have made it. Indeed, all evidence of handwriting, except where the witness saw the document written or signed, is, in its nature, comparison. It is the belief which a witness entertains, upon comparing the writing in question with its exemplar in his mind, derived from some previous knowledge acquired in some of the various ways mentioned in the books, that the writing in question is genuine. 1 Greenl. Ev. secs. 567, 577. Where the writing upon which the witness founds his opinion or knowledge of

the party's handwriting are letters or other writings, and are of such a nature as to make it probable that they were written by the hand from which they purport to come, the witness in such case will be admitted to speak to that person's handwriting. As said by Mr. Phillipps (2 Phillipps, Ev. p. 600), "the admissibility of the evidence must depend upon this,—whether there is good reason to believe that the specimens from which the witness has derived his knowledge were written by the supposed writer of the paper in question." Or, as said by the same learned author (2 Phillipps, Ev. p. 601), "The knowledge of handwriting may be acquired by these or any other modes of communication between the party and the witness, which, in the ordinary course of the transactions of life, would induce a reasonable presumption that the letters or documents were the handwriting of the party."

In recent times the rule upon this subject, like the rule in respect to most questions of evidence, has been considerably liberalized and extended, and made to conform to the reasonable requirements of the present methods of the ordinary transactions of life; and this is shown by what was said by the Supreme Court, in the case of *Rogers* v. *Ritter,* 12 Wall. 317, 322, 20 L. ed. 417, 419. In that case, in speaking of the knowledge of handwriting and the modes by which that knowledge may be acquired, the court said: "The difficulty has been in determining what is proper knowledge, and how it shall be acquired. It is settled everywhere that, if a person has seen another write his name but once, he can testify; and that he] is equally competent, if he has personally communicated with him by letter, although he has never seen him write at all. But is the witness incompetent unless he has obtained his knowledge in one or the other of these modes? Certainly not; for in the varied affairs of life there are many modes in which one person can become acquainted with the handwriting of another, besides having seen him write or corresponded with him. There is no good reason for excluding any of these modes of getting information, and if the court, on the preliminary examination of the witness, can see that he has that degree of knowledge of the party's handwriting

which will enable him to judge of its genuineness, he should be permitted to give to the jury his opinion on the subject."

At the conclusion of the evidence, the court gave a very explicit instruction to the jury in regard to the letter in question; and instructed the jury that, before they could consider the alleged contents of the letter claimed to have been written by the accused in July, 1903, they must find from the evidence, beyond a reasonable doubt, that it was in the handwriting of the accused. With this instruction before them, to be considered in connection with all the evidence upon the subject, it is difficult to perceive how the jury could have been led into any mistake in their finding upon the subject. We think there was no error in any of the rulings of the court covered by the third assignment of error.

4. The next assignment of error relates to the alleged incompetency of a witness, Miss Georgia C. Ivey, to testify for the government, because not properly designated in the list of witnesses to be called for the prosecution, and which is required to be furnished the accused, under § 1033 of the Revised Statutes of the United States (U. S. Comp. Stat. 1901, p. 722). The object and purpose of the provision is to furnish the accused with a list of the witnesses upon whose testimony he may be tried for the crime charged against him. In this case, the witness and her mother had names precisely identical, and both lived in the same house. In the list of witnesses the name Georgia C. Ivey appeared at two places, separated by thirty-four intervening names. Neither was distinguished by the prefix Miss or Mrs., and there was nothing to indicate which was the mother or which the daughter. They both had the same place of address. Was the accused justified in presuming that there was but one person represented by these names so appearing in the list?

There is nothing to show that the accused was in any manner misled, or in any way prejudiced, by the manner in which the two witnesses were named in the list. The point of the objection seems to have been that the persons named should have been distinguished by some proper prefixes or additions to indicate

that they were different persons.    But there was no presumption that there was but one person in fact named twice in the list. The presumption was rather the other way, that there were two different persons of the same name, living in the same house. This we know is frequently the case in families,—the father and son, or mother and daughter, bearing the same name.    But there is nothing in the statute to require the use of prefixes or affixes to names for purpose of distinction. If the accused had really been in doubt as to the matter, and deemed it of importance to his defense, he could easily have applied to the court for direction to the prosecution officers to make the necessary correction in the list, and thus remove the difficulty,—a thing that the court, in its discretion, would have readily done, if there was reason to suppose that the accused was liable to be misled to his prejudice.    But no such action was taken; and the witness was simply objected to as incompetent to testify for the government. We perceive no error in overruling the objection to this witness.

5. The fifth assignment of error relates to the ruling of the court in permitting Doctor Jelliffe, a competent expert witness on questions of insanity, to give his opinion as to the condition of mind of the accused on August 22, 1903, based upon an examination of the accused made by the witness November 1, 1903,— the examination being made after an interval of two months and eight days from the time of the commission of the crime.    There is no question about the competency of the witness to speak as an expert,—that is conceded.    The question is as to his competency to give an opinion as to the sanity or insanity of the accused at the time of the homicide, based upon a full personal examination of the accused made two months and eight days thereafter.    A very full personal examination appears to have been made by the witness of the accused while the latter was confined at the jail; and, against the objection of the accused, the witness was allowed to give an opinion that the accused was sane at the time of the commission of the crime.    This opinion was formed, of course, upon the condition of the mind of the accused as shown at the time of the examination, and such *indicia* as existed of its previous condition.    The mental defects spoken of by some of

the witnesses for the accused were of a congenital nature, or natural infirmities of mind, manifesting themselves through life.

But we cannot perceive the reason why, if mental maladies existed of any kind, the skilled expert in the science of mental diseases would not be able to discover the signs or traces of such disease after so short a time from the violent manifestation of such mental disorder as is claimed to have existed in the case of the accused.   Mental diseases, or the violent and unrestrained disorders of the mental powers, do not disappear in a day, or a week, or a month, except in cases of casual drunkenness.   And if such mental derangement existed as to render the accused irresponsible for the brutal and shocking homicide of his former wife only two months and eight days before the examination by the witness, it is hardly conceivable that all traces and *indicia* of the malady, by the time of the examination, had disappeared, so that the skilled witness was led into an erroneous and unfounded opinion as to the sanity of the accused at the time of the homicide.   If the diseased and insane condition of mind existed, as supposed, at the time of the homicide, that condition of mind would have existed, at least to some extent and in some form, at the time of the examination of the accused by the witness, and the latter would have been unable to conclude, as he did, from the then condition of the party, that his mind was sane, and was sane at the time of the homicide; or, in other words, that the accused "was of sound mind."   The witness being a skilled expert, and having stated that he could form, and had formed, an opinion as to the sanity of the accused at the time of the homicide, based upon a personal examination of the accused made two months and eight days thereafter, that opinion of the sanity or soundness of mind of the accused was admissible as evidence to the jury to be considered by them.

There is nothing singular or peculiar in such opinion or the mode of arriving at it.   Similar questions have been before the courts before the present, and have been disposed of as we have disposed of the present question.   In the case of *Freeman* v. *People,* 4 Denio, 9, 40, 47 Am. Dec. 216, the judge, in delivering the opinion of the court, said:   "I entertain no doubt that

such a witness [an expert witness] should be allowed to express
an opinion in regard to the mental condition of a person alleged
to be insane in the month of March, although the opinion may
have been founded solely on an examination made in the succeed-
ing July. In most cases, undoubtedly, the opinion would be
more satisfactory and convincing when based on observations
made at or about the time to which the inquiry relates.   But
this is not decisive against the reception of such evidence, though
founded on examinations made at a later period.   The compe-
tency of the testimony is one question, and its effect another.
The first is for the court, and the latter for the jury.   It will
sometimes, undoubtedly, be found, and perhaps not unfrequent-
ly, that the mental malady is such that an examination would
disclose beyond all peradventure to a skilful physician what
must have been the condition of the patient for months or years
before."

In the case of *People* v. *Hoch,* 150 N. Y. 291, 44 N. E. 976,
the question was somewhat different, but it was ruled upon the
same principle as in the preceding case.   In *Hoch's Case* the dis-
trict attorney showed by a skilful physician, who had charge of
Auburn prison, that he, the witness, had made an examination
of the defendant, for the purpose of ascertaining his mental con-
dition, just before and during the trial.   He had observed him
from day to day, and he stated just what he had done in examin-
ing him.   He was asked whether, in his opinion, the defendant
was sane or insane; to which question an objection was made
because it did not relate to the time of the homicide, but the ob-
jection was overruled.   The contention on the part of the de-
fendant was, that the inquiry should be as to his condition on the
day of the homicide, and not at the time of the trial.   "Of
course," said the court, "the issue turns upon the prisoner's
mental condition at the time of the homicide,—whether he was
laboring under such a defect of reason as to render him incapable
of knowing the nature and quality of the homicidal act, or was
incapable of knowing that it was wrong.   But there is no ap-
parent reason, and I am aware of no authority, for holding that,
in addition to all the other facts, the jury may not be informed,

by one competent to speak, as to the mental condition of the defendant at the time of his trial. He stands before them accused of the crime, with the plea of insanity to shelter him from a conviction at their hands, and, in their consideration of his plea for exoneration, no competent evidence bearing upon his mental condition at the time of the homicide, or since, should be excluded; and the evidence objected to certainly cannot be said to be prejudicial to any substantial rights of the accused, or to contravene the demands of justice."

The witness in the present case had no hesitation in saying that he was able, from the examination had, to form an opinion of the mental condition of the accused at the time of the homicide, and that he was then of sound mind. We are clearly of opinion that this evidence of the witness was admissible, and that there was no error in the ruling of the court in respect thereto.

6. The last assignment of error relates to a passage in the charge of the judge below to the jury, upon the whole evidence, wherein the jury were told that no weight was to be given to the opinion of lay witnesses or nonexperts on the question of insanity, unless that opinion was based upon facts testified to before the jury, and unless the jury entertain the same opinion as the witnesses on the facts proved before them.

The passage in the charge upon which this assignment of error is based is as follows: "But sometimes questions come along of a nature such that all the facts bearing upon the matter are not susceptible of being reproduced before the jury through the medium of words. So it is with the question of the mental condition of an individual; it is not possible to reproduce before you all the facts which are *indicia* upon this point; for example, appearance, expression of countenance, attitude, continuity or rationality of discourse, or the opposite of it, or the like; therefore in such an inquiry it is appropriate to hear opinions upon the point from those whose personal observation of the facts of the matter has been such as to qualify them to form intelligent opinions upon the very point. But the opinion of a layman, although expressed before you, is without weight unless it appear

that, as a foundation for the opinion, he entertained a knowledge of facts proved before you, which, in your judgment, warrant and support the opinion which he has expressed. Another class of opinions which you have heard is that of physicians," etc.

What is said in this passage of the charge of the learned judge would seem to have been said by way of contrasting the mere naked opinions of the lay witnesses with those of the skilled physicians. The whole charge must, however, be read together, to ascertain the real meaning and import of the language of the judge; and we think there is no ground for imputing error to this particular passage when read in connection with what precedes and what succeeds it in reference to the question of insanity. The question of the competency of the witness is for the court, and the court must see, in order to determine the question of competency, that the witness has such knowledge as will enable him to express an opinion as to the sanity or insanity of the party whose mind is the subject of inquiry; for otherwise the witness would not be competent to testify, not being an expert. But when the witness is held to be competent, the question of the weight and value of his opinion, or whether it is of any value at all, is solely a question for the jury. And the question of the value of his opinion will depend upon the circumstances under which he testifies; the degree of intelligence displayed by him; his opportunities for knowledge of the party under inquiry; and his knowledge of facts and circumstances calculated to make an impression upon an observer as to the mental condition of the party whose mind is the subject of inquiry. But if, upon examination of the witness, it be found that he is without reliable knowledge of the party, his habits or peculiarities, or his mode of life, and only has a slight acquaintance with him, and such as cannot, in the nature of things, enable him, the witness, to form an intelligent opinion of the mental condition of the party, then such an opinion, though it be expressed, is entitled to no weight whatever, as a means of forming a rational basis for the verdict of a jury. If, therefore, the jury be satisfied in their own minds that such a witness, that is, a nonexpert witness, is thus without reliable knowledge of facts

or circumstances to enable him to form an opinion as to the sanity or insanity of the party whose condition of mind is the subject of inquiry, it would seem to be clear that the opinion of such witness is without weight or value, and that there would be no error in the judge in so informing the jury; and that is all that was done in this case, in the charge that was given the jury, as we read it.

The courts have not always been uniform in stating the rule upon which the opinions of nonexpert witnesses are received and allowed to be considered by the jury, on questions of alleged insanity.    But, as said by the Supreme Court, in *Connecticut Mut. L. Ins. Co.* v. *Lathrop,* 111 U. S. 619, 28 L. ed. 539, 4 Sup. Ct. Rep. 533, in stating the rule upon this subject:    "The jury being informed as to the witness's opportunities to know all the circumstances and of the reasons upon which he rests his statement as to the ultimate general fact of sanity or insanity, are able to test the accuracy or soundness of the opinion expressed, and thus, by using the ordinary means for the ascertainment of truth, reach the ends of substantial justice."    This is simply saying that, in the light of all the circumstances and reasons that may be stated by the witness as the basis of his opinion, the jury may be able to test the accuracy or soundness of the opinion expressed; and, of course, if the jury are satisfied that the opinion expressed by the witness is without foundation in reason or fact, that opinion can have no weight in enabling the jury to reach a rational conclusion on the question of sanity *vel non.*

In the very recent case of *Queenan* v. *Oklahoma,* 190 U. S. 548, 47 L. ed. 1175, 23 Sup. Ct. Rep. 762, the question arose as to what a nonexpert witness could prove as to the condition of the prisoner's mind.    It was a case of homicide, and where the only defense was insanity.    A lawyer, called as a witness for the defendant, stated that he knew the prisoner quite well; that the prisoner was his barber and had been for some years, and that he saw him on the day before the killing.    He then described the appearance and conduct of the prisoner, and said that at the time he did not notice any difference from the prisoner's usual

demeanor. He was then asked if since the killing he had formed an opinion as to the prisoner's mental condition at that time. This opinion he was not allowed to state; and this refusal to allow the opinion to be given, was alleged as error. "It will be seen," says the Supreme Court, "that the witness was allowed to sum up his impressions received at the time. The court said in terms that he might state any condition that existed then, or any impression that it made upon the witness's mind as to the prisoner's condition. That is all that was decided in *Connecticut Mut. L. Ins. Co.* v. *Lathrop,* 111 U. S. 612, 28 L. ed. 536, 4 Sup. Ct. Rep. 533." The ruling of the court below was affirmed.

Upon reading the entire charge of the judge to the jury, we can perceive no possible ground of complaint by the accused. Take it altogether, and the case was most favorably presented for the accused. After the passage in the charge upon which error is assigned, and in conclusion, the court said: "Gentlemen of the jury, you are the sole judges of the facts in the case, and essentially the sole judges of the credibility of the witnesses who have appeared upon the stand. And you must accord to individual witnesses and the testimony given by them that degree of effect, in reaching your verdict, which in your honest judgments you think they ought to have, taking into consideration, in so far as you can conclude upon that point, from the manner and appearance of the witnesses upon the stand, and the manner of the giving of their testimony,—whether it be frankly and honestly given; his apparent intelligence, or the lack of it; what his opportunity and ability was to observe facts that transpired within his presence, or what was his radius of observation at the time, his capacity to remember what he has at prior times observed; and lastly, his ability to express and communicate here to you through the medium of words, accurately that which passed within his observation at prior times; considering what, if any, interest a witness has in the outcome of the case, and whether, on this account, he is coloring in any way the facts related in his testimony; and again, whether or not there be manifested by any particular witness feeling, and, if so, whether or not that is coloring his testimony one way or the other."

It would seem that all pertinent considerations were fully presented to and left open for the determination of the jury, and, upon full review of the case on the errors assigned, we find nothing to require a reversal of the judgment below. An over-refinement in the application of principles is seldom promotive of justice; and, where a case has been fairly tried, over-refined distinctions, or forced application of technicalities, should never be indulged, when that indulgence leads necessarily to the defeating of a fair trial. Nothing less than substantial error should produce that result.

We must affirm the judgment, and it is so ordered.

*Judgment affirmed.*

A petition by the appellant to the Supreme Court of the United States for the writ of certiorari was denied by that court.