UNITED STATES v. NESMITH.
Cr. No. 399–54.

United States District Court
District of Columbia.
June 4, 1954.

Rex K. Nelson, Washington, D. C., for defendant, for the motion.

Edward P. Troxell, Asst. U. S. Atty., Washington, D. C., opposed.

HOLTZOFF, District Judge.

The question presented on this motion is whether it constitutes a violation of the privilege against self-incrimination for the Government to introduce in evidence in a criminal case the chemical analysis of a urine specimen furnished by the defendant in compliance with a request or direction of a law enforcement officer. This subject is of growing importance because of the increasing use of scientific tests in criminal prosecutions.

This case comes before the court on a motion by the defendant to suppress evidence. The defendant has been indicted on a charge of manslaughter arising out of a fatal automobile accident. After being arrested and questioned by the police, he was requested or directed to furnish a urine specimen, presumably for the purpose of having it analyzed in order that it might be determined whether he was under the influence of liquor at the time in question. He complied with the request or direction. He now moves to suppress the specimen as evidence on the ground that the taking of the specimen constituted a violation of the privilege against self-incrimination guaranteed by the Fifth Amendment to the Constitution of the United States.

A solution of the problem requires a consideration of the meaning and scope of the privilege against self-incrimination. Originally, the common law did not recognize any such right. For example, Howell's State Trials are replete with reports of trials during which the defendant was searchingly and sharply questioned by the prosecuting attorney or by the court. A notable example is the trial of Sir Walter Raleigh, where the

defendant was ferociously interrogated and savagely denounced in open court by Sir Edward Coke, who was then Attorney General.[1] The privilege against self-incrimination developed and took form in the Seventeenth Century, and then became a part of the law of England.[2] This basic and valuable individual right was adopted by the Founding Fathers and made one of the constitutional guarantees of every person in the United States. It is embodied in the Fifth Amendment to the Constitution, which among other things provides that, "No person * * * shall be compelled in any criminal case to be a witness against himself,[3] * * *." Similar provisions are found in most, if not all, State constitutions.

 This clause of the Fifth Amendment applies to the defendant in every criminal case. He may not be called as a witness or interrogated by Government counsel unless he voluntarily takes the witness stand in his own behalf, thereby waiving the privilege. This safeguard extends also to every witness in any legal proceeding. The privilege may be exercised by a refusal to answer any question on the ground that the answer may tend to incriminate the witness.

 The basis of this rule is that no one should be required to help to convict himself of a crime by his own sworn oral testimony. This doctrine is not an inherent natural right, for many civilized systems of law do not recognize it, but it is deeply imbedded in Anglo American jurisprudence. Every one has a constitutional privilege to take the position that if he is to be prosecuted for a crime, oral testimony in support of the charge may not be wrung from his unwilling lips. It is an irresistible, logical inference, therefore, that if a witness in any proceeding refuses to reply to a question on the ground that his response

may tend to incriminate him, he impliedly admits that any truthful answer that he might give would tend to prove that he committed a criminal offense, or at least, that he committed an act which might or might not constitute a violation of the criminal law. The privilege may not be invoked in good faith for the purpose of avoiding answers to embarrassing questions, or to queries concerning matters that the witness does not desire to discuss. It may not be utilized to shield others. It may not be employed for the purpose of protecting oneself from the possibility of a future prosecution for perjury in the event that it should be charged that the answer that the witness gave was knowingly false. The witness, however, need not give any justification or supply any explanation for invoking the privilege, provided that the question is such that some possible answer to it may prove incriminating. Any doubt as to this matter must be resolved in favor of the witness, although if patently no answer to the inquiry could under any circumstances be incriminating, the assertion of the privilege may be overruled.

 This discussion of the privilege against self-incrimination in its setting leads to the next question, namely, how far does it extend? The Supreme Court, in an opinion by Mr. Justice Holmes, in Holt v. United States, 218 U.S. 245, 252, 31 S.Ct. 2, 6, 54 L.Ed. 1021, definitively ruled that the privilege is restricted to oral testimony and does not preclude the use of one's body as evidence. In that case, the question arose whether a certain blouse belonged to the defendant. He was then required to put on the blouse in order that it might be determined whether it fitted him. The objection was raised that this course was a violation of the provision. Mr. Justice Holmes, after referring to this objection as an ex-

---

1. 2 Howell's State Trials 26.

2. For a detailed history of the privilege against self-incrimination, see Wigmore on Evidence, § 2250–2252.

3. Although the Fifth Amendment was not a part of the Constitution originally, some of the Founding Fathers were among the framers of the first ten Amendments.

travagant extension of the Fifth Amendment, made the following comment:

"But the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material."

This limitation has been invariably applied whenever the problem has arisen. Thus in Shaffer v. United States, 24 App. D.C. 417, 426, the Court of Appeals for the District of Columbia, in an opinion written by Chief Justice Alvey, overruled an objection to the action of the Government in photographing the accused while holding him in custody and then using that photograph in procuring his identification at the trial. The learned Chief Justice wrote as follows on this point in 24 App.D.C. at page 426:

"This objection is founded upon the theory that the use of the photograph so obtained is in violation of the principle that a party cannot be required to testify against himself, or to furnish evidence to be so used. But we think there is no foundation for this objection. In taking and using the photographic picture there was no violation of any constitutional right. There is no pretense that there was any excessive force or illegal duress employed by the officer in taking the picture. We know that it is the daily practice of the police officers and detectives of crime to use photographic pictures for the discovery and identification of criminals, and that, without such means, many criminals would escape detection or identification. It could as well be contended that a prisoner could lawfully refuse to allow himself to be seen, while in prison, by a witness brought to identify him, or that he could rightfully refuse to uncover himself, or to remove a mark, in court, to enable witnesses to identify him as the party accused as that he could rightfully refuse to

allow an officer, in whose custody he remained, to set an instrument and take his likeness for purposes of proof and identification."

In McFarland v. United States, 80 U.S.App.D.C. 196, 150 F.2d 593, the Court of Appeals for this Circuit held that evidence of presence of blood on the defendant's body was admissible. After quoting the statement of Mr. Justice Holmes in Holt v. United States, supra, 80 U.S.App.D.C. at page 197, 150 F.2d at page 594, the Court observed:

"Out of court as well as in court, his [i. e. the defendant's] body may be examined with or without his consent."

In Smith v. United States, 88 U.S.App. D.C. 80, 86, 187 F.2d 192, 198, it was held that for police officers to dye the defendant's hair and then to present him for identification by potential witnesses did not constitute self-incrimination. Judge Fahy wrote as follows on this point:

"We do not think that the rule against compulsory self-incrimination properly applies to pretrial efforts to identify a suspect as the probable perpetrator of a crime even though these efforts involve physical examination or observation of the suspect against his will."

This principle has also been recognized and applied in other circuits. Thus, in Haywood v. United States, 7 Cir., 268 F. 795, 802, it was stated:

" * * * unless the origin and purpose of the command be disregarded and the key word be turned into an unintended, if not impossible, meaning, no compulsion is forbidden by the Fifth Amendment except testimonial compulsion."

In Swingle v. United States, 10 Cir., 151 F.2d 512, 513, Judge Phillips made the following comment:

" * * * the prohibition against compelling an accused person to be a witness against himself is a prohibition of the use of physical or moral compulsion to extort communi-

cations from him, and not an exclusion of his body as evidence when it may be material."

In United States v. Kelly, 55 F.2d 67, 83 A.L.R. 122, the Court of Appeals for the Second Circuit, in an opinion written by Judge Augustus N. Hand, in which Judges Learned Hand and Swan concurred, approved the practice of fingerprinting a prisoner and then introducing the fingerprints in evidence against him.

In Bratcher v. United States, 4 Cir., 149 F.2d 742, 745–746, the factual situation was very similar to that confronted in the case at bar. The opinion was written by Judge Northcott and concurred in by Judges Parker and Soper. The defendant had been convicted of evading service in the armed forces under the Selective Training and Service Act, 50 U.S.C.A.Appendix, § 301 et seq., by presenting himself for induction while in an abnormal physical condition artifically induced by the use of benzedrine, thereby causing his rejection for service. Evidence was introduced tending to show that before appearing for physical examination the defendant took benzedrine for the purpose of causing high blood pressure. Because of suspicion that this had been done, the defendant was required to furnish a specimen of his urine and from an analysis of the specimen it appeared that he had been taking benzedrine. Objection to the introduction of the evidence as violative of the Fourth and Fifth Amendments was held untenable.

The law is clear, therefore, that the privilege against self-incrimination is limited to the giving of oral testimony. It does not extend to the use of the defendant's body as physical or real evidence. The conclusion is inevitable that it does not bar the use of secretions of the defendant's body and the introduction of their chemical analysis in evidence.

Rochin v. People of California, 342 U.S. 165, 72 S.Ct. 205, 210, 96 L.Ed. 183, on which defense counsel relies, is not in point, as it dealt with an entirely different principle. The case was decided under the due process clause of the Fourteenth Amendment, and did not involve the privilege against self-incrimination under the Fifth Amendment. In that case, local deputy sheriffs receiving information that the defendant was selling narcotics, broke into his room. He immediately seized two capsules and put them in his mouth. A struggle ensued, in the course of which the officers attempted to extract them. After these efforts proved unavailing, he was immediately taken to a hospital and a stomach pump was forcibly applied to him against his will. As a result the two capsules were vomited by the defendant. It was but natural for the Supreme Court to hold that the means used to obtain these capsules were so cruel and abhorrent to standards of decency as to constitute a violation of due process of law. The Court remarked that, "They are methods too close to the rack and the screw to permit of constitutional differentiation", and again, "to sanction the brutal conduct which naturally enough was condemned by the court whose judgment is before us, would be to afford brutality the cloak of law". The principle of this case would be applicable here if force had been exerted or threats made to compel the defendant to comply with the demand for a specimen, or if some instrument had been forcibly applied to his body in order to obtain it. No such situation is presented, however, and no question of due process of law arises. The problem confronted is of a different nature, namely, whether the introduction of evidence of this kind obtained in the manner pursued in this case would constitute a violation of the privilege against self-incrimination. For the reasons heretofore discussed, the answer is manifestly in the negative.

Motion to suppress is denied.