COMMONWEALTH of Kentucky, DEPARTMENT OF PUBLIC SAFETY, Appellant,

v.

Joseph Jolly HAYDEN, Appellee.

Court of Appeals of Kentucky.

June 23, 1972.

Mary Jo Arterberry, Frankfort, for appellant.

William E. Rummage, Owensboro, for appellee.

NEIKIRK, Justice.

The Department of Public Safety revoked the driver's license of Joseph Jolly Hayden because Hayden, allegedly, refused to submit to a blood-alcohol test upon request of an Owensboro police officer. KRS 186.-565(3). The revocation subsequently was sustained at a hearing held by the Department of Public Safety pursuant to KRS 186.565(4). The Daviess Circuit Court, upon petition by Hayden, found that the final order of the Department revoking Hayden's driver's license was not supported by substantial evidence and, therefore, was arbitrary and capricious. The revocation was set aside. The Department appeals. We affirm.

The only issue presented on this appeal is whether there was substantial and competent evidence to support the administrative finding that Hayden had refused to submit to a blood-alcohol test. KRS 186.-565(2) provides:

"Any person who is dead, unconscious or who is otherwise in a condition rendering him incapable of refusal, is deemed not to have withdrawn the consent provided in subsection (1) of this section and the test may be given."

Hayden claims that he was so drunk he was "in a condition rendering him incapable of refusal," wherefore the officers should have proceeded to give him the test. The Department maintains that the evidence when considered in its totality is contra.

An examination of the record convinces us that Hayden was capable of a refusal but that there was no positive refusal on his part to take the test in response to a specific request by the arresting officer. The pertinent testimony on this point as elicited from the arresting officer is as follows:

"Answer: When I stopped him the second time, I had him to get into my cruiser. At this point, I had asked him—I mentioned or explained the blood-alcohol test to him and asked him if he would want to take the blood-alcohol test, and at that time he didn't want to, or he said he didn't. I finished writing the citation and when the wagon arrived, well, we again—Curtis Johnson, Jr., and myself both asked him if he wanted to take the test and he refused, or wouldn't.

Question 15: Do you remember or can you say in general, the exact way that you mentioned the test to Mr. Hayden?

Answer: Well, I explained we had—in Kentucky, there is an Implied Consent Law. That any time they are suspected or charged with Driving Under the Influence, they have a choice if they want to take the blood-alcohol test or not, there's nobody will make them take it; it's up to them, but if they do not take the test, it's automatic suspension of the driver's license for six months.

Question 16: Do you remember what Mr. Hayden's response to this was?

Answer: Well, I never could get a definite yes or no from him. He acted like he really didn't know what I was talking about. I'll be truthful with you."

\* \* \* \* \* \*

"Question 22: \* \* \* After the other officer arrived on the scene, did you yourself mention the test again to Mr. Hayden?

Answer: Yes, ma'am.

Question 23: Do you remember any response he made at that time?

Answer: Again, not any specific words that he used."

\* \* \* \* \* \*

"Question 7: Well, he did have some trouble walking, that you noticed?

Answer: Yes sir, quite a bit of trouble walking.

Question 8: Had trouble following your commands about getting the driver's license out, didn't he?

Answer: Yes sir. Yes sir.

Question 9: And dropped cards and didn't follow your commands, other commands, and that is, isn't it, evidence of a man that is extremely inebriated?

Answer: Yes sir.

Question 10: And he didn't—as I understand from your testimony, he really didn't—because of his drunken stupor, he didn't comprehend your explanation to him about the Implied Consent Law?

Answer: Well, its's possible that he didn't fully understand me.

Mr. Rummage: Yes sir, that's all."

\* \* \* \* \* \*

"Question 1: Officer Richardson, you stated in your testimony here, now, that you asked him at least on two occasions to take the test?

Answer: Yes sir.

Question 2: But on neither of these occasions did he answer you either way?

Answer: That I can recall, definitely saying yes or no, I can't recall him ever saying either one of the words, definitely."

Hayden testified that he had "no knowledge or recollection of any questions or anything."

In the circumstances related, Hayden's condition obviously was such as to make it difficult for the officers to obtain his consent or refusal to the test, but we are not convinced that Hayden was in such a stupor or state of extreme intoxication as to render him incapable of refusing to take the test. He could walk, follow directions, and make decisions. His senses were dulled but he was not senseless. We believe the officers by firm and positive requests, carried if necessary to the extent of making preparations to give the test, could have elicited definite consent or refusal from Hayden. The trouble is that they did not show a positive request and refusal.

We have held that before the Department has sufficient evidence to revoke a driver's license under KRS 186.565(3), there must be a positive and specific "request" addressed to the licensee to take the test contemplated in the statute. Commonwealth, Department of Public Safety v. Powers, Ky., 453 S.W.2d 260 (1970); Timberlake v. Commonwealth, Department of Public Safety, Ky., 464 S.W.2d 283 (1971); Craig v. Commonwealth, Department of Public Safety, Ky., 471 S.W.2d 11 (1971).

We hold that in addition to a "request" there must be a refusal. The refusal may be either express or by conduct.

In a situation such as here presented, the arresting officers are confronted with a difficult choice. If they choose to treat the accused as too drunk to refuse the test, and they proceed to give him the test, they may subject themselves to a suit by the accused in which he claims he was not that drunk. If on the other hand they choose to try to elicit from him a positive consent or refusal, they are faced with the practical problem of getting a coherent an-

swer. On balance, however, we believe the latter course should be followed whenever there is any reason for doubt.

■ In our opinion, a plea of extreme intoxication is not such a condition as to render a person incapable of responding to a definite and positive "request" unless the person is in a complete drunken stupor or "passed out." We do not excuse a drunken person if he commits murder simply because he is drunk. Neither should we excuse a drunken driver from taking the blood-alcohol test simply because he at a later time says that he was too drunk to understand the questions propounded to him by an officer.

We decide the instant case on the weakness of the officer's testimony, not on the strength of Hayden's admitted drunkenness.

The judgment is affirmed.

MILLIKEN, HILL, OSBORNE, PALMORE, and REED, JJ., concur.

Separate concurring opinion by OSBORNE, J.

STEINFELD, C. J., dissents, stating: "I dissent as I believe the explanation and requests of the officers complied with the rationale of Craig v. Commonwealth, Dept. of Public Safety, Ky., 471 S.W.2d 11 (1971)".

OSBORNE, Justice (concurring).

I dissented in Commonwealth, Department of Public Safety v. Craig, Ky., 471 S.W.2d 15, because I believed then, and still believe, the law requiring a blood-alcohol test violates both the Kentucky and Federal Constitutions. The large number of appeals coming to this court subsequent to that opinion has convinced me that I was right. The public highly resent this procedure. I am convinced their resistance springs from a resentment to the degrading process of having a police officer require them to undergo the embarrassment of having their blood drained and analyzed as if they were common laboratory animals. In short, the process violates the principles of common human dignity.

As stated in my dissenting opinion in Craig, I am in sympathy with any program that will assist in removing the drinking driver from the highway and if the blood alcohol test were the only method available, I might be more sympathetic toward it. The blood-alcohol test is not the only method available. The breathalyzer is an accurate and accepted method of checking for sobriety. It is more humane in the administration and does not have the unconstitutional features of the blood-alcohol test. In the use of the breathalyzer, there is no invasion of the subject's body. The air that he exhales is a product resulting from normal body function. The capturing of this air and its analysis does not involve an invasion of the body itself. It is my opinion that the breathalyzer is more acceptable factually and constitutionally than the blood-alcohol test.

Many thoughtful persons are concerned with what appears to be a headlong rush into a police state. While some courts still appear to be upholding fundamental constitutional rights, it would appear that others are ignoring them altogether. This past week the Supreme Court of the United States struck down the practice of federal agents' tapping telephone wires. This would appear to be a good sign and in line with the philosophy laid down by the Supreme Court many years ago in Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 296 L.Ed. 746. In this case the Supreme Court held a defendant in a criminal prosecution for failure to pay import duties on goods shipped into the United States could not be forced to produce incriminating papers, for to do so would violate his rights under the 5th Amendment. While the Supreme Court has set this tone, lower federal courts and many of the state courts seem to be driving hard in the other direction. For the student who is interested in just how far matters have gone, see the

American Law Reports, Later Case Service Supplement, 25 ALR 1370–1379, where the following cases appear:

"Physical examination of defendant, and removal of narcotics from his rectum, involved no violation of privilege against self-incrimination, was not unreasonable search and seizure, and did not deny due process. Blackford v. U. S. (C.A.9, Cal.) 247 F.2d 745.

Self-incrimination privilege is limited to giving of oral testimony, and is not violated by use of urine specimen, in criminal prosecution, to show whether defendant was under influence of alcohol at the time specimen was given. U. S. v. Nesmith (D.C.Dist.Colo.) 121 F.Supp. 758.

Accused in rape case was not forced to give incriminating evidence against himself when blood sample, tissue scrapings, and saliva samples were taken and used in evidence. Brent v. White (D.C. La.) 276 F.Supp. 386.

Admission in sodomy prosecution of evidence of smears and slides taken from defendant's genitals did not violate defendant's immunity to self-incrimination or right as against unreasonable search and seizure. People v. Morgan, 146 Cal. App.2d 722, 304 P.2d 138.

In narcotics prosecution, evidence established that heroin capsules which accused spat out when police officer seized him by the throat were not obtained as result of unreasonable search and seizure in violation of accused's privacy, due process, and self-incrimination rights. People v. Sanches, 189 Cal.App.2d 720, 11 Cal.Rptr. 407."

The foregoing cases speak much more eloquently than I possibly can as to how far the matter has gone. I humbly and respectfully suggest we pause and ponder where we have come. When an accused charged with failure to pay import duties cannot be forced to disclose discriminating papers, as such disclosure would violate his rights under the 5th Amendment, it is amazingly strange to me that one accused of selling dope, committing rape, or driving while intoxicated may have his blood let, genitals scraped, rectum probed, may be forced to urinate into a bottle and, if necessary, choked until he spits up the evidence. The cynics in our society would say this conclusively shows that there is one set of laws for the affluent businessman and another for the rest of us. Thanks be that I am not a cynic. I am proud to live in a land where my telephone calls cannot be monitored, nor my private correspondence scrutinized. Maybe someday my government will see fit to protect my genitals, rectum, bladder, blood stream and esophagus. As I remain of the opinion that the blood-alcohol test violates Sections 10 and 11 of the Constitution of this state along with Articles 4 and 5 of the Constitution of the United States, I concur in the results reached by the majority today.